1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DANIEL J. MARTINEZ,**<br><br>Petitioner,<br><br>v.<br><br>**MATTHEW CATE,**<br><br>Respondent. | **Case No. 1:11-cv-00572 AWI MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Craig S. Meyers of the office of the California Attorney General.

**I.      PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Stanislaus, following his conviction by jury trial on May 6, 2008, of second degree murder, participation in a criminal street gang, and other charges. (Clerk's Tr. at 506-08.) On June 30, 2008, Petitioner was sentenced to an indeterminate term of forty years to life in state prison. (Id.)

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

District on February 24, 2009. (Lodged Doc. 10.) The appeal was denied on December 18, 2009. (Lodged Doc. 15.) On January 15, 2010, Petitioner filed a petition for review with the California Supreme Court. (Lodged Doc. 16.) The petition was summarily denied on March 24, 2010. (Lodged Doc. 17.)

On March 22, 2010, Petitioner filed a petition for writ of habeas corpus with the Stanislaus County Superior Court. (Lodged Doc. 18.) The petition was dismissed by way of a reasoned opinion on the same date. (Lodged Doc. 19.) Petitioner proceeded to file petitions for writ of habeas corpus with the California Court of Appeal and the California Supreme Court. Both petitions were summarily dismissed. (See Lodged Docs. 20-23.)

Petitioner filed his federal habeas petition on April 7, 2011. (Pet., ECF No. 1.) The petition raised seven different claims for relief, listed as follows:

1.) Petitioner was denied his right to Due Process and a fair trial when the court allowed inadmissible gang evidence;

2.) The jury was inadequately instructed with CALCRIM No. 1400;

3.) The police misled Petitioner on his right to counsel, rendering his Miranda warnings ineffective;

4.) Petitioner was denied his right to confrontation when the pathologist testified;

5.) Petitioner was denied his right to confrontation when the trial court excluded evidence of Sandoval's sentence;

6.) Petitioner was denied his right to Due Process and a fair trial due to the prosecution arguing that Petitioner was responsible for gang tagging, and;

7.) Petitioner was denied his right to Due Process and a fair and impartial jury by the trial court's failure to properly instruct the jury on the elements of second degree murder.

(Pet. at 4-7, ECF No. 1.)

Respondent filed an answer to the petition on September 25, 2012, and Petitioner filed a traverse on November 28, 2012. (Answer & Traverse, ECF Nos. 21, 25.) The matter stands ready for adjudication.

II.   **STATEMENT OF THE FACTS**[1]

### A. Factual and Procedural Background

As of December 8, 2005, Kristian Sandoval had been residing at 1309 Alamo Street, Modesto, for approximately four months. The neighborhood was "gang infested," and included both residents claiming Norteno membership and those claiming Sureno membership.**[FN4]** Sandoval became acquainted with the mother of the Garcia family, which lived across the street at 1310 Alamo. Two of her sons, who were about 17 or 18 years old, were Surenos. They bragged about their gang involvement to Sandoval, and one-Jefte Garcia-showed him the San Diego tattoo on his back.**[FN5]**

**FN4**. From what Sandoval knew, the block on which he lived was mostly run by Northerners, but the whole neighborhood was basically a Sureno neighborhood. The area was particularly dominated by the South Side Trece gang, a fairly large set of Surenos.

**FN5**. For the sake of clarity, the brothers-Jefte and Jair Garcia-will be referred to by their first names. No disrespect is intended.

Martinez lived two doors down from Sandoval. Sandoval first met him about two weeks after moving to 1309 Alamo, and they became good acquaintances. Sandoval saw Martinez "hanging out" with Lopez every day. Martinez and Lopez often wore red items of clothing, and they claimed Norteno.

Around 6:00 p.m. on December 8, Sandoval was inside his house with his friend, Lounny Manivong. They were in the kitchen when appellants knocked on Sandoval's door. Referring to the Garcia brothers, one said that the guys were over there, that something was going to happen, and that they had gone and gotten a gun or something like that. Sandoval did not hear any commotion, but Martinez asked him for "the gauge." Sandoval knew him to be referring to the pump-action, sawed-off shotgun appellants had left at Sandoval's house approximately two days earlier. Sandoval knew the gun was loaded; while appellants were showing it to him when they first brought it over, someone had put shells into it.

Sandoval retrieved the firearm, unwrapped it, and handed it to Lopez, who was standing right next to Martinez. Sandoval still did not hear any commotion outside, but warned that he did not want anything stupid happening in front of his house. Appellants then walked down the driveway. Lopez put the gun behind his back, under his sweatshirt.

As appellants walked down the driveway with Sandoval and Manivong following, they started exchanging words with the Garcia

---

[1]The Fifth District Court of Appeal's summary of the facts in its December 18, 2009 opinion is presumed correct. 28 U.S.C. § 2254(e)(1).

brothers, who were across the street on the sidewalk in front of their house. One of the Garcias-Sandoval believed it was Jefte-was accusing appellants of having tagged "YGL" on their sidewalk.**[FN6]** His tone of voice was angry. Martinez responded with an obscenity and forcefully denied that he or Lopez had done it.

> **FN6**. "YGL" stands for "Young Gangster Locos" (also sometimes shown as "Young Gangsta Locos" in the reporter's transcript). The letters were painted facing toward the Garcia residence, so that someone going outside would read them.

Appellants stopped about halfway down the driveway, next to Manivong's car. The exchange between appellants and the Garcia brothers lasted approximately two to three minutes, during which time Lopez was just holding the shotgun behind his back.

Sandoval told the Garcia brothers to get back in their house and not be little kids, and he told appellants to take "their shit" somewhere else, but things escalated. Jefte was extremely angry. He walked into the middle of the street, took off his shirt, and started saying he was a grown man and all tatted up. He turned the "SD" tattoo on his back toward appellants, Sandoval and Manivong, and said "'this is San Diego'" or something, and something Surenos. He pointed at his back and also held up a blue San Diego hat. Sandoval considered this a gang challenge or gang call-out. He saw no weapons on or about the person of either Jefte or Jair. It appeared to him that Jefte wanted to have a fist fight.

Martinez yelled back his gang set, saying, "'This is YGL.'" Jair, who was standing behind Jefte, said, "'I'll peel your guys' cap back,'" meaning he was going to shoot the other group's way or shoot somebody. Sandoval interpreted the statement as a death threat against everyone in the group by Sandoval's house. Jair, who had on a shirt, reached one hand behind his back. Lopez pulled out the shotgun from under his sweatshirt and pointed it forward. Martinez told Lopez, "'Just do it.'" Seconds later, which was a matter of seconds after Jair had made the verbal threat, Sandoval heard a single gunshot from Lopez's direction. By this time, Lopez was outside Sandoval's fence, adjacent to the mailbox in front of the sidewalk. Everyone ran; Sandoval told Manivong to get out of there, then Sandoval ran back inside his house. He did not know anybody had been shot at this point, but when he looked out, he saw a person he believed to be Jair, squatting down inside the fence in the middle of the Garcia yard and talking on his phone. Sandoval could not see Jefte's body, because it was dark.

Sandoval went up into his attic. He did not call 911. The SWAT team extracted him about an hour later.

Portions of Manivong's account of events differed from Sandoval's version. Manivong had been present at Sandoval's house on several occasions when one or both appellants were there. Sometimes, Lopez would talk about how some of the neighbors were "scraps." Manivong understood this to be a derogatory term for Surenos. A couple of weeks before the shooting, Manivong was at Sandoval's house when Sandoval produced what appeared to be the weapon subsequently fired by Lopez. Sandoval said he was using it for protection.

Manivong arrived at Sandoval's house between 5:00 and 6:00 p.m. on December 8, and he and Sandoval smoked some marijuana. Manivong smoked half a blunt, which is a cigar filled with marijuana. He described himself as being only a little high.

After appellants came to the door, Manivong walked out of the house before Sandoval. When Sandoval came outside, he was carrying some sort of bag over his shoulder. Manivong could not tell what it was and did not see what Sandoval did with it.

The only words Manivong heard spoken by Jair were at the outset.**[FN7]** When Manivong walked out of the house, Jair was the first one to talk about the graffiti and disrespect. Manivong saw no weapons about his person, nor did he ever hear any threats to shoot, or any references to firearms, from either brother. At no time did Manivong believe the brothers were going to shoot at him. However, once Jefte pulled off his shirt, Manivong's attention was focused exclusively on him, and he did not know where Jair was or what he was doing.

> FN7. Manivong did not know the names of the Garcia brothers and referred to them as the individual who took off his shirt and the second person. We have inserted the names to the extent established by other evidence.

After taking off his shirt, saying he was from San Diego, and flipping his hat back, Jefte said, "'Let's fight. Let's go. Let's down.'" Manivong saw no weapon in Jefte's hands or on his person. He did not hear Martinez say anything after Jefte started walking toward the middle of the street. However, Lopez suggested a couple of times that they go to the corner. Lopez had his hands behind his back when he said this. Jefte responded, "'No, let's fight right here.'" When Lopez produced the sawed-off shotgun from behind his back and held it against his hip, Jefte turned and ran. Manivong did not hear either brother, or either appellant, say anything. No more than two to three minutes elapsed from the time Jefte walked to the middle of the street and took off his shirt to when Lopez pulled out the shotgun. During those minutes, Jefte was verbally challenging them to fight. Lopez pulled out the shotgun very shortly after the final time he suggested going to the corner. He pumped the shotgun and fired it almost immediately after pulling it out. He fired just one shot, at Jefte. Sandoval and appellants then ran toward the house; Manivong got in his car and drove off.

Stanislaus County Sheriff's Deputy Alves was dispatched to the 1300 block of Alamo at about 7:00 p.m., in response to a call that someone had been shot. He found a body near the front entrance of the residence at 1310 Alamo. The person appeared to have one gunshot wound to the arm and one to the eye. Alves saw no weapons on or around the person, and no shell casings in the yard or evidence of an exchange of gunfire. Detective Hatfield saw a spray-painted message on the sidewalk in front of 1310 Alamo. A line had been drawn through the letters with black spray paint, and a black spray paint can was found on the trunk of a car parked on the front lawn of the residence. What appeared to be fresh bullet holes were found running through the front wall of the house, as well as in items on the front lawn. Expended projectiles and a fragment were recovered from inside 1310 Alamo. The shot pattern and recovered pellets

were consistent with a double-aught buck shotgun blast.**[FN8]** Although no firearms or ammunition were found inside the house, Hatfield did find a magazine for an air soft gun, a toy that shoots small rubber bullets, in the front room. Some types of that toy gun look very realistic.

> **FN8**. Double-aught buckshot consists of .32-caliber pellets.

After the shooting, Martinez arrived on a bicycle at a residence on Hatch Road, a short distance from Alamo, at which Librado Lopez was staying. **[FN9]** Martinez stated, "'I shot this fool, man. I smoked his ass'" and "'I just shot this fool, shot this scrap.'" He was excited and bragging. When some of the people at the house told him that the boy might not make it and it was serious, Martinez responded that he did not care and that he hoped he died.

> **FN9**. Librado Lopez had suffered a number of prior felony convictions and was a registered sex offender.

Jefte suffered a bullet wound to the right eye that penetrated the brain, and another to the right inner forearm. Bullet fragments consistent with double-aught buckshot were recovered from the brain. The cause of death was gunshot wound to the brain. Once the gunshot entered Jefte's eye, he would have been rendered immediately unconscious and died shortly after. He might have had some reflexive action and taken a few steps, but he would not have done any purposeful activity after the shot. He was facing the weapon when shot.

On December 10, Martinez was arrested at the residence on Hatch, where he had stayed since arriving after the shooting. Later that day, Detective Navarro informed him of his rights and then took a statement from him. In part, Martinez said that the subjects across the street had started the argument that led to the shooting. He said the gun, which came from Sandoval's residence where he thought it had been for a couple of weeks, was only fired once. He also said the shotgun was loaded before it was fired, but he denied having loaded it. Navarro asked whether, during the confrontation prior to the shooting, Martinez felt threatened by the individual who took off his shirt. Martinez said he guessed yeah, but at the same time no. Later, he said he guessed not. He also said he did not see any gun. He said, however, that the other subjects could have a weapon in their pocket or something. Martinez denied being a gang member, but admitted associating with the Northerners. When asked if he associated with YGL Northerners, Martinez said no. He said he saw the guys across the street crossing out the tagging in their front sidewalk area. When Navarro asked whether crossing out a rival gang's sign was disrespecting that gang, Martinez answered affirmatively. Navarro gave a hypothetical in which a Sureno and Norteno argued, and the Sureno took off his shirt and showed a Sureno tattoo to the Norteno, and asked whether that was disrespect. Martinez again answered affirmatively. When Navarro asked what would happen if a gang noticed a rival gang was covering up the first gang's graffiti, Martinez said he did not know and was not "'into gangs like that.'"

Shortly after 1:00 a.m. on February 2, 2006, Lopez was located and arrested at a house on Florence Avenue in Modesto. Later that morning, Navarro interviewed Lopez after advising him of his rights. Lopez said that he had seen one of the individuals from across the street with a spray

paint can. When asked what the individuals were saying or doing when they came out on the street, Lopez said they were issuing a challenge to fight. He also remembered one saying he was from San Diego and "'getting all crazy.'" Lopez said the individual also said, " We don't play. We'll fuckin' smoke your ass, you know what I'm saying?'" Lopez said the two were known to have weapons and, while they did not make any threats to him, one said they were going to blast "them." Lopez said Sandoval gave him the gun. Lopez said he had a feeling that one of the subjects had something, and that he thought he had seen the one without a shirt grabbing something from his pants. Lopez said he saw a gun and had to protect himself. He felt like it was going to be them or him. Lopez admitted that when he saw what appeared to be a gun, he pointed the shotgun. When he did that, the other individual pulled his weapon. Lopez said that he did not "wake up in the morning and decide to go kill somebody," and that he feared for his life and thought the other individual was going to kill him. When Navarro observed that there was no gun and asked how the other man was going to kill Lopez, Lopez said "that's just the way they were talking." He insisted he had seen something, and started describing a black revolver. Lopez remembered the other individuals running, and somebody saying, "'Shoot.'" Lopez said he was still scared for his life. Later, Navarro asked if Lopez was sure the other individual pulled something out, or if it was just because of what he was saying with his mouth. Lopez replied, "'It was probably that.'" When Navarro suggested Lopez never saw a gun, Lopez responded that he did not see a gun, but he saw something.

When Navarro asked whether Lopez knew if the man he had shot was a Sureno, Lopez said he was not sure, but was pretty sure they were toward the end. Later, Lopez said that if the subject from the street would not have said anything to him, he would not have said anything. Lopez said he already knew the person was a Sureno. When Navarro asked the name of Lopez's gang, Lopez said he was just a Northerner. Navarro asked whether he was part of YGL; Lopez again responded that he was just a Northerner. Lopez said he had been claiming Norte (Northerner) since he was 14, but that this was not a gang-related killing.

Maria Estrada was the mother of Jefte and Jair. She never saw either of her sons with a firearm, nor had she ever seen a gun in the house. A few months before the shooting, she witnessed an exchange of gestures and words between Jair, Martinez, and a young man with Martinez. On another occasion, she observed Martinez and two others, all of whom were wearing red T-shirts, verbally attack Jefte and Jair. Ms. Estrada had no knowledge of any criminal street gangs on Alamo Street, and did not suspect her sons were involved with gangs. They wore blue, as the whole family liked the color. Jefte had a blue bandanna. Although born in Modesto, both boys grew up in Southern California.

The residence at 1310 Alamo was searched shortly after the shooting. A blue bandanna was found in the kitchen. Various items indicative of gang involvement were found in the search of 1309 Alamo and 1245 Alamo, which was Martinez's residence. Found on the floor of the living room of that residence were two unfired Federal brand double-aught buck, three-inch magnum shotgun rounds. The residence on Hatch, where Martinez was arrested, was searched shortly after his arrest. Gang related items were found. According to Librado Lopez, it was common for a number of people to be at the house. Some were Nortenos; none were

Surenos. A Sureno would "get shot or something." The residence on Florence, where Lopez was arrested, was searched shortly after his arrest. Indicia of residency for Anthony Gonzales were found, as were gang-related items.

Stanislaus County Sheriff's Detective Soria, an expert on criminal street gangs, testified that appellants were YGL members, and that YGL was part of the Norteno gang. The primary criminal activities of the Norteno criminal street gang include homicides, drive-by shootings, assaults with deadly weapons, auto thefts, burglaries, robberies, and home invasions-in other words, crimes of violence. These are generally perpetrated against members of the Nortenos' rival gang, the Surenos. The Sureno criminal street gang has similar primary criminal activities. Norteno gang members thrive on respect, and demand it from fellow Nortenos and from rival gang members. They generally respond with violence to acts of disrespect by rival gang members. They also thrive on fear. Fear, intimidation, and respect benefit Nortenos in conducting their criminal activities because they know people will not report their activities to law enforcement.

According to Soria, the area in which the shooting took place was high in Norteno and Sureno gang activity. Gangs are territorial, and graffiti tells the community and rivals who controls the neighborhood. Tagging a sidewalk in a position in which the occupants of a residence walk out of their house and see "YGL X4" is consistent with targeting that particular residence. The perpetrators want the residents immediately to observe the rival gang's tagging on their property, which is a form of disrespect. Defacing a rival gang's graffiti by crossing it out is a form of ultimate disrespect and a cause of violence.

Based on the evidence in this case and other information available to him, such as records of prior law enforcement contacts, Soria opined that on December 8, 2005, Sandoval was actively participating in the Nortenos criminal street gang; appellants were actively participating in the Nortenos criminal street gang, specifically the Young Gangster Locos; and Jefte and Jair were both actively participating in the Surenos criminal street gang, specifically South Side Trece (SST). YGL and SST were enemies. **[FN10]**

> **FN10**. Beginning in December 2005, Modesto Police Officer Gumm was given information, by a juvenile offender who claimed Sureno, concerning a stabbing and several shootings-including a homicide-perpetrated by SST members. The juvenile also named Lopez as being under threat of death from SST. The juvenile spoke about the shooting of Jefte Garcia; he identified an individual he said was a friend of Lopez as being involved.

Soria further opined that the shooting of Jefte Garcia was committed for the benefit of, and in association with, a criminal street gang. The shooting benefited the gang because the crime bolstered the reputation not only of the individuals involved, but also of their gang. Both fellow and rival gang members would know that these people will take violent action against their rivals; members of the community would think twice about cooperating with law enforcement concerning criminal activities in their neighborhood.

8

(Pet, Ex. A.; People v. Martinez, 2009 WL 4881793, *1-6 (Cal. App. 2009)).

## II.  DISCUSSION

### A.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

### B.  Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

1          1.       Contrary to or an Unreasonable Application of Federal Law

2          A state court decision is "contrary to" federal law if it "applies a rule that

3  contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

4  that are materially indistinguishable from" a Supreme Court case, yet reaches a different

5  result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06.

6  "AEDPA does not require state and federal courts to wait for some nearly identical

7  factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

8  even a general standard may be applied in an unreasonable manner" Panetti v.

9  Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

10  "clearly established Federal law" requirement "does not demand more than a 'principle'

11  or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state

12  decision to be an unreasonable application of clearly established federal law under §

13  2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

14  (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-

15  71 (2003).  A state court decision will involve an "unreasonable application of" federal

16  law only if it is "objectively unreasonable."  Id. at 75-76, quoting Williams, 529 U.S. at

17  409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

18  Court further stresses that "an *unreasonable* application of federal law is different from

19  an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011), (citing Williams, 529

20  U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks

21  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

22  correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541

23  U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

24  have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S.

25  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

26  Federal law for a state court to decline to apply a specific legal rule that has not been

27  squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

28  (2009), quoted by Richter, 131 S. Ct. at 786.

1          2.      Review of State Decisions

2          "Where there has been one reasoned state judgment rejecting a federal claim,

3    later unexplained orders upholding that judgment or rejecting the claim rest on the same

4    grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the

5    "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

6    (9th Cir. 2006). Determining whether a state court's decision resulted from an

7    unreasonable legal or factual conclusion, "does not require that there be an opinion from

8    the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85.

9    "Where a state court's decision is unaccompanied by an explanation, the habeas

10   petitioner's burden still must be met by showing there was no reasonable basis for the

11   state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does

12   not require a state court to give reasons before its decision can be deemed to have been

13   'adjudicated on the merits.'").

14         Richter instructs that whether the state court decision is reasoned and explained,

15   or merely a summary denial, the approach to evaluating unreasonableness under §

16   2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

17   or theories supported or, as here, could have supported, the state court's decision; then

18   it must ask whether it is possible fairminded jurists could disagree that those arguments

19   or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

20   Thus, "even a strong case for relief does not mean the state court's contrary conclusion

21   was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75). AEDPA "preserves

22   authority to issue the writ in cases where there is no possibility fairminded jurists could

23   disagree that the state court's decision conflicts with this Court's precedents." Id. To put

24   it yet another way:

25              As a condition for obtaining habeas corpus relief from a federal
         court, a state prisoner must show that the state court's ruling on the claim
26       being presented in federal court was so lacking in justification that there
         was an error well understood and comprehended in existing law beyond
27       any possibility for fairminded disagreement.

28   Id. at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts

11

1    are the principal forum for asserting constitutional challenges to state convictions." Id. at

2    787. It follows from this consideration that § 2254(d) "complements the exhaustion

3    requirement and the doctrine of procedural bar to ensure that state proceedings are the

4    central process, not just a preliminary step for later federal habeas proceedings." Id.

5    (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

6                   3.    Prejudicial Impact of Constitutional Error

7         The prejudicial impact of any constitutional error is assessed by asking whether

8    the error had "a substantial and injurious effect or influence in determining the jury's

9    verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

10   U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

11   state court recognized the error and reviewed it for harmlessness). Some constitutional

12   errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v.

13   Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

14   (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective

15   assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

16   Strickland prejudice standard is applied and courts do not engage in a separate analysis

17   applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002). Musalin

18   v. Lamarque, 555 F.3d at 834.

19   **III.    REVIEW OF PETITION**

20        **A.    Claim One: Introduction Of Gang Evidence**

21        Petitioner contends that the state court's admission of gang evidence was

22   excessive and prejudicial, violating his right to a fair trial.

23                   1.    State Court Decision

24        Petitioner presented this claim by way of direct appeal to the California Court of

25   Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

26   appellate court and summarily denied in subsequent petition for review by the California

27   Supreme Court. (See Lodged Docs. 15, 17.) Because the California Supreme Court's

28   opinion is summary in nature, this Court "looks through" that decision and presumes it

adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the California Court of Appeal explained:

> Extensive gang-related evidence was admitted at trial. Appellants now make multiple claims of error with respect to some of it, and conclude admission both violated state law and denied them their right to due process.

**1. Lay opinion**

> Appellants complain that the trial court admitted, over objection, lay opinion testimony to prove the gang charges. They specifically point to the following:
>
> · Sandoval's testimony that from what he knew, the block on which he lived was run mostly by Northerners, but the whole neighborhood was basically a Sureno neighborhood;
>
> · Sandoval's testimony that spray-painting gang graffiti on a rival's property was "a big disrespect";
>
> · Manivong's testimony that Lopez talked about how some of Sandoval's neighbors were "scraps," and that this referred to gang members who claimed blue;
>
> · Manivong's testimony that, when Jefte was challenging to fight and talking about San Diego, Manivong thought perhaps he was a Sureno; and
>
> · Librado Lopez's purported testimony that 508 East Hatch was a "gang house."
>
> We need not further discuss the claim with respect to Librado Lopez's testimony: Contrary to appellants' reading of the record, the trial court sustained a defense objection, based on lack of foundation, to the question whether Librado Lopez considered the residence to be a gang house. The question was never answered. As to the other challenged testimony, we find no error.
>
> "A lay witness may testify to an opinion if it is rationally based on

the witness's perception and if it is helpful to a clear understanding of his testimony. (Evid. Code, § 800.)" (People v. Farnam (2002) 28 Cal.4th 107, 153.) "Perception" is "the process of acquiring knowledge 'through one's senses' [citation], i.e., by personal observation." (People v. McAlpin (1991) 53 Cal.3d 1289, 1306, fn. omitted.) The rule "merely requires that witnesses express themselves at the lowest possible level of abstraction. [Citation.] Whenever feasible 'concluding' should be left to the jury; however, when the details observed, even though recalled, are 'too complex or too subtle' for concrete description by the witness, he may state his general impression. [Citation.]" (People v. Hurlic (1971) 14 Cal.App.3d 122, 127.)

A trial court's decision to admit lay opinion "will not be disturbed 'unless a clear abuse of discretion appears.' [Citations.]" (People v. Mixon (1982) 129 Cal.App.3d 118, 127; see People v. Medina (1990) 51 Cal.3d 870, 887, affd. sub nom. Medina v. California (1992) 505 U.S. 437.) Based on his observations while living there, Sandoval described the neighborhood -- without objection -- as "gang infested."**[FN17]** The prosecutor asked what Sandoval had perceived that led him to this opinion, and Sandoval gave specific examples of what he had seen. When inquiring whether it was a Norteno- or Sureno-controlled neighborhood, the prosecutor expressly asked for Sandoval's perception from living there. The prosecutor specifically based his questions concerning "disrespect" on Sandoval's four months in the neighborhood, conversations with gang members, and understanding of gang rules. Manivong testified that he was raised in Modesto and was around gang members in Modesto schools, and that in high school, he became familiar with colors worn by people claiming to be gang members and with derogatory terms they called each other. Manivong also testified to having lived in a neighborhood where gang activity was prevalent. There was no abuse of discretion here.

> FN17: "A witness' personal knowledge of a matter may be shown by any otherwise admissible evidence, including his own testimony." (Evid. Code, § 702, subd. (b).)

## 2. Gang expert's conclusions

Appellants next contend the trial court improperly allowed the gang expert, Detective Soria, to express legal conclusions, over repeated objections, on the ultimate facts to be decided by the jury. They point to the following testimony by Soria, which was elicited by the prosecutor:

· On December 8, 2005, appellants both were actively participating in a criminal street gang, specifically the Norteno criminal street gang, in particular Young Gangster Locos;

· The shooting of Jefte Garcia was committed for the benefit of, and in association with, a criminal street gang, the benefit coming from the fact that the crime bolsters the reputation of the individuals involved and also of the gang, both in the community and throughout the county.

Appellants further contend the trial court compounded the asserted error by refusing to allow them the same leeway on cross-examination and preventing them from questioning the witness on the same ultimate facts. **[FN18]** They point to the following instances, which we describe in some

detail in order to provide context:

> **FN18**. Appellants moved for a mistrial based on the trial court's rulings in this regard. Their motion was denied.

· Soria agreed with defense counsel that criminal street gangs do not have membership cards, and, especially in Hispanic street gangs, there is no clear point at which it can be seen that someone is a member. When asked if that was why he had the somewhat arbitrary system of eight or 10 criteria for determining membership, Soria responded, "It goes on the opinion of the gang investigator, yeah." Defense counsel subsequently used the example of "Raider Nation" football fans and asked if they fit the Penal Code definition of a criminal street gang. Soria said no, because their primary activities consisted only of being sports fans. Counsel then asked who decided what the primary activity was, and Soria responded that it was based on interpretation of the law. When defense counsel asked, "Well, you can only have one primary activity, can't you?" the trial court sustained the prosecutor's objection that it misstated the law. Defense counsel then asked, "The point is, there is no law, is there?" An objection was again sustained, with the trial court observing that the jury would be instructed on the various definitions and ultimately would make the decision. The trial court then sustained the prosecutor's objection, that the form of the question was argumentative, to defense counsel's question, "Now, gee, it wouldn't seem fair that somebody who belonged to the Norteno gang that may -- which includes most of Northern California from Bakersfield up and somebody up in -- in Erika [sic] steals a car that belongs to the -- that belongs to the Nortenos, not the guy that steals it, not the car that somebody here in Modesto would be charged with knowledge of that." Defense counsel then asked, "Doesn't the alleged gang members [sic] have to have knowledge of the criminal purpose and agree with the criminal purpose of the criminal street gang in order to be an active participant?" After argument over whether the question misstated the law and Soria understood it, Soria was permitted to answer.

· On redirect examination, Soria was asked what was meant in the gang context by the term "putting in work." He explained that it meant a person was doing things for the gang, such as committing crimes and conducting jump-ins. Soria further opined that a person could not actively participate in a criminal street gang without putting in any work, and that someone must put in work to be a gang member. On recross-examination, defense counsel inquired, "[I]s it your opinion that Pablo Lopez shot Jefte Garcia as a means of putting in work?" The trial court immediately stated, "The jury will decide the facts in this case. An expert opinion on what the jury should or should not do is not helpful."

· Evidence was presented of writing about "drive-bys" on a door at the Hatch residence. When defense counsel suggested it was pretty much like a poem, Soria responded that it was much more than a poem; it was a statement, although not necessarily a confession. He agreed with defense counsel that a poem could be a statement, as could a rap song. Defense counsel then asked, "Isn't the same as the Jandra? **[FN19]** It has that kind of -- I mean, I'm 44, but --" The prosecutor objected pursuant to Evidence Code section 352, stating that it should be reserved for argument. The objection was sustained.

> **FN19**: We assume the word was actually "genre."

15

· Defense counsel asked Soria how well he knew Lopez. When Soria responded that he did not know him personally, counsel asked whether, in Soria's expert opinion, Lopez was a typical gang member. Soria answered that Lopez had conducted himself in a way that typical gang members do. When counsel insisted, "So, yes, he's a typical gang member?" Soria answered, "Sure." Counsel then asked whether typical gang members were violent, murderous people. When Soria responded that a lot of them were, counsel clarified, "Are you saying some typical gang members are, and some typical gang members aren't?" Soria responded, "Sure," and agreed with counsel that there were many different types of typical gang members of varying degrees of criminality. Defense counsel then asked, "And is it your opinion that Mr. Lopez chose to fire that gun to show off in front of witnesses and bolster his reputation and the reputation of the Norteno criminal street gang?" The prosecutor's objection, that the question went to a specific intent argument not within the purview of the expert, as well as being beyond the scope of redirect examination, was sustained. Defense counsel then asked whether it was Soria's opinion that a typical gang member reacts to disrespect swiftly and with violence. Soria responded yes, depending on different variables. Counsel then asked whether in this case, based on the evidence Soria had seen in court, Lopez armed himself and remained armed, without drawing the weapon, while being disrespected. The trial court sustained the prosecutor's objection that the question was argumentative, stating, "Those are determinations the jury necessarily will make." When defense counsel stated that he was going to ask Soria whether, in his opinion, Lopez would behave like a typical gang member, the court responded, "That's what the jury needs to determine." Defense counsel argued that Soria had already testified, in response to the prosecutor's questions, concerning what typical gang members do, and so he could express an opinion. The trial court disagreed, stating: "What typical gang members do is relevant and subject to an opinion. Whether or not the defendant is guilty of [sic] innocent is something the jury decides."

· Defense counsel asked Soria whether, because Lopez had "14" tattooed on his legs, wore red, claimed to be affiliated with Young Gangster Locos, and claimed to be a Norteno, Soria held him accountable for all crimes committed by all Nortenos. Soria responded, "Directly, no," but agreed that Lopez was a willing participant in a paramilitary group of thousands of people and a member of a terrorist organization. When counsel asked whether all people who claimed red, or claimed Norteno, were responsible for the criminal acts of any other Norteno, Soria responded that the question was a broad one, because when a Norteno commits and is convicted of a crime, that crime can later be used against other Nortenos as a predicate act; so, in that sense, the answer was yes. When counsel asked if this was so "even if the Nortenos had never heard of each other," Soria said, "That does happen, yes." Counsel then asked, "So bearing that in mind, using that same reasoning, would you hold all Muslims accountable for 9[/]11?" The prosecutor's Evidence Code section 352 objection was sustained.

Evidence of gang affiliation and activity, though potentially prejudicial, is relevant and admissible when the reason for the underlying crime is gang related. (People v. Samaniego (2009) 172 Cal.App.4th 1148, 1167; People v. Gonzalez (2005) 126 Cal.App.4th 1539, 1550.) "'[B]ecause a motive is ordinarily the incentive for criminal behavior, its

16

probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (<u>People v. Gonzalez</u>, supra, at p. 1550.)

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness [citation] and to give testimony in the form of an opinion [citation]. Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' [Citation.] The subject matter of the culture and habits of criminal street gangs … meets this criterion. [Citations.]" (<u>People v. Gardeley</u> (1996) 14 Cal.4th 605, 617.) Included within "culture and habits" is "testimony about the size, composition or existence of a gang [citations], gang turf or territory [citations], an individual defendant's membership in, or association with, a gang [citations], the primary activities of a specific gang [citations], motivation for a particular crime, generally retaliation or intimidation [citations], whether and  [79] how a crime was committed to benefit or promote a gang [citations], rivalries between gangs [citation], gang-related tattoos, gang graffiti and hand signs [citations], and gang colors or attire [citations]." (<u>People v. Killebrew</u> (2002) 103 Cal.App.4th 644, 657, fns. omitted.)

"Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however. [Citations.]" (<u>People v. Gardeley</u>, supra, 14 Cal.4th at p. 618.) Moreover, a trial court "should prevent the use of misleading or unfair hypothetical questions …. [Citations.]" (<u>People v. Wilson</u> (1944) 25 Cal.2d 341, 348-349.) "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) There is no hard-and-fast rule concerning when a question goes beyond embracing the ultimate issue and improperly invades the province of the jury; "'We think the true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved…. Oftentimes an opinion may be received on a simple ultimate issue, even when it is the sole one, as for example where the issue is the value of an article, or the sanity of a person; because it cannot be further simplified and cannot be fully tried without hearing opinions from those in better position to form them than the jury can be placed in.' [Citations.]" (<u>People v. Wilson</u>, supra, at p. 349.) A trial court is vested with wide discretion to determine relevance or weigh the prejudicial effect of proffered evidence against its probative value pursuant to Evidence Code section 352, and its rulings will not be disturbed absent an abuse of that discretion. (<u>People v. Cooper</u> (1991) 53 Cal.3d 771, 816; <u>see also</u> <u>People v. Barnett</u> (1998) 17 Cal.4th 1044, 1118.) "This discretion is not, however, unlimited, especially when its exercise hampers the ability of the defense to present evidence." (<u>People v. Cooper</u>, supra, at p. 816.)

We find no abuse of discretion here. Soria properly was allowed to testify to his conclusions that appellants were actively participating in a criminal street gang at the time of the shooting, and that the shooting was committed for the benefit of, and in association with, a criminal street gang. (<u>People v. Garcia</u> (2007) 153 Cal.App.4th 1499, 1512-1514; <u>see</u>

People v. Lindberg (2008) 45 Cal.4th 1, 48-50; People v. Gonzalez, supra, 126 Cal.App.4th at pp. 1550-1551; People v. Valdez (1997) 58 Cal.App.4th 494, 507-509.) He was also properly allowed to testify in terms of what might be expected of "typical" gang members. (See People v. Ward (2005) 36 Cal.4th 186, 209-210; People v. Zepeda (2001) 87 Cal.App.4th 1183, 1207-1209.) Appellants were able to question Soria concerning whether there were different levels of gang involvement, and whether someone could claim Norte and not be a gang member. They were also permitted to question him concerning his view that anyone who claimed the letter "N," number 14, and color red, basically was a domestic terrorist, and they effectively used analogies involving Raider Nation, Muslims, and the Los Angeles Police Department. They were even allowed to question Soria by analogizing the relationship between YGL and Nortenos to that between a Muslim and al Qaeda. They explored the criteria for gang membership at length, including their purported arbitrariness and law enforcement's asserted ability to change them at will, and at one point elicited Soria's testimony that someone could be considered a gang member in Stanislaus County, but not a gang member in San Diego. Appellants were also able to elicit Soria's testimony that, if it is assumed most Nortenos react to disrespect with violence, and that Lopez is a Norteno, it is not necessarily logical or fair to conclude that Lopez reacts to disrespect with violence.

To a large extent, the questions that were disallowed did not seek to ask about the conduct of typical gang members, but instead inquired specifically about the conduct and intent of appellants personally, the type of testimony this court held improper in People v. Killebrew, supra, 103 Cal.App.4th at page 658 and In re Frank S. (2006) 141 Cal.App.4th 1192, 1199. The trial court did not err by disallowing the questioning.

### 3. Gang-related physical evidence

Appellants claim the trial court erred by admitting, over repeated objections, assertedly irrelevant and prejudicial evidence of gang affiliation found at Sandoval's home and the house on Hatch, where Martinez was arrested. These items, which included a television stand, brick, table, piece of cardboard, notebook, and door, bore writing such as "'YGL 14,'" "'Huero X4,'" **[FN20]** "'Norte,'" "'DSSM'" (Deep South Side Modesto), and Norteno-related symbols.

**FN20**: According to Soria, "Huero" was Lopez's "moniker."

"Evidence is relevant if it has any tendency in reason to prove a disputed material fact. (Evid. Code, § 210.)" (People v. Waidla, supra, 22 Cal.4th at p. 718.) A trial court has wide discretion to determine relevance. (See People v. Gallego (1990) 52 Cal.3d 115, 173.) "Evidence Code section 352 permits a trial court in its discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice…. For this purpose '"prejudicial" means uniquely inflammatory without regard to relevance.' [Citation.] 'Evidence is substantially more prejudicial than probation [citation] if … it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.]" (People v. Lindberg, supra, 45 Cal.4th at p. 49.) Relevance and Evidence Code section 352 rulings are reviewed for abuse of discretion. (People v. Rowland (1992) 4 Cal.4th 238, 264; see People v. Waidla, supra, 22

Cal.4th at pp. 717-718; People v. Martinez (2003) 113 Cal.App.4th 400, 413.)

We reject the notion that there was an insufficient nexus between appellants and the locations at which the challenged evidence was found, or that it was relevant only for the forbidden purpose of establishing guilt by association. (See Mitchell v. Prunty (9th Cir. 1997) 107 F.3d 1337, 1342, overruled on other grounds in Santamaria v. Horsley (9th Cir. 1998) 133 F.3d 1242, 1248.) The prosecutor proffered the evidence not only on the basis that there was an adequate relationship between appellants and the locations, but, more importantly, on the ground that it showed the relationship between the Nortenos and subgroups, including YGL. Indeed, Soria testified that the evidence showed collaboration between YGL and other Nortenos. This purpose was not only relevant, and the evidence particularly probative on the point, but it was virtually indispensible to establishing YGL as a part of the Norteno criminal street gang so that the status as such and deeds of the larger group could be ascribed to the smaller one. (See People v. Williams (2008) 167 Cal.App.4th 983, 987-989.)

**4. Prejudice**

Even assuming some errors occurred, in light of the wealth of properly admitted evidence, there is no reasonable probability the jury would have returned a verdict more favorable to either appellant in absence of the error. (People v. Watson (1956) 46 Cal.2d 818, 836 (Watson); see People v. Benavides (2005) 35 Cal.4th 69, 91; People v. Price (1991) 1 Cal.4th 324, 429.) We reject appellants' attempts to turn whatever abuse of discretion may have occurred (and we have found none) into federal constitutional error. (See People v. Benavides, supra, 35 Cal.4th at p. 91; People v. Boyette (2002) 29 Cal.4th 381, 419, fn. 6.)**[FN21]**

> **FN21**. In his prejudice analysis, Martinez relies in part in People v. Reynolds (2006) formerly 139 Cal.App.4th 111. As this case was ordered depublished on August 23, 2006, it is not citable. (Cal. Rules of Court, rules 8.1105, 8.1115.)

People v. Martinez, 2009 Cal. App. Unpub. LEXIS 10039, 68-85 (Cal. App. Dec. 18, 2009).

2.      Analysis

The United States Supreme Court has expressly left open the question of whether the admission of propensity evidence violates due process. See Estelle v. McGuire, 502 U.S. at 75, n.5; Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001). In Estelle, it expressly refused to determine whether the introduction of prior crimes evidence to show propensity to commit a crime would violate the Due Process Clause. Id. ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show

1  propensity to commit a charged crime."); see also Alberni v. McDaniel, 458 F.3d 860,

2  866 (9th Cir. 2006) ("Estelle expressly left this issue an 'open question'"). Because the

3  Supreme Court has specifically declined to address whether the introduction of

4  propensity evidence violates due process, Petitioner lacks the clearly established federal

5  law necessary to support his claims. Id.; see also Mejia v. Garcia, 534 F.3d 1036, 1046-

6  47 (9th Cir. 2008) (relying on Estelle and Alberni and concluding that the introduction of

7  propensity evidence under California Evidence Code § 1108 does not provide a basis for

8  federal habeas relief, even where the propensity evidence relates to an uncharged

9  crime); Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (The Supreme Court

10  "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial

11  evidence constitutes a due process violation sufficient to warrant issuance of the writ.").

12      Accordingly, the state courts' rejection of Petitioner's claim could not have been

13  "contrary to, or an unreasonable application of, clearly established" United States

14  Supreme Court authority, since no such "clearly established" Supreme Court authority

15  exists. 28 U.S.C. § 2254(d)(1).

16      Nevertheless, there can be habeas relief for the admission of prejudicial evidence

17  if the admission was fundamentally unfair and resulted in a denial of due process.

18  Estelle, 502 U.S. at 72; Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v.

19  Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993); Gordon v. Duran, 895 F.2d 610, 613 (9th

20  Cir. 1990). Constitutional due process is violated if there are no permissible inferences

21  that may be drawn from the challenged evidence. Jammal v. Van de Kamp, 926 F.2d

22  918, 919-20 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise

23  more than one inference, some permissible, some not." Id. at 920. "A habeas petitioner

24  bears a heavy burden in showing a due process violation based on an evidentiary

25  decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).

26      The California Court of Appeal applied a standard identical to the federal

27  standard. On appeal, the California court found that "Evidence of gang affiliation and

28  activity, though potentially prejudicial, is relevant and admissible when the reason for the

1    underlying crime is gang related. Because a motive is ordinarily the incentive for criminal

2    behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is

3    permitted in admitting evidence of its existence." (citing <u>People v. Samaniego</u> (2009) 172

4    Cal.App.4th 1148, 1167 and <u>People v. Gonzalez</u> (2005) 126 Cal.App.4th 1539, 1550.).

5    Evidence of gang affiliation is admissible when it is relevant to a material issue in the

6    case. <u>United States v. Easter</u>, 66 F.3d 1018, 1021 (9th Cir. 1995) (citing <u>United States v.</u>

7    <u>Abel</u>, 469 U.S. 45, 49 (1984) (finding gang evidence admissible to show bias)). The

8    Court of Appeal concluded that the "challenged evidence had direct relevance to and

9    was directly probative of the gang enhancements to establish the predicate offenses and

10   appellants' continuing participation in the gang. <u>People v. Martinez</u>, 2009 Cal. App.

11   Unpub. LEXIS 10039 at 78-79. The gang evidence was introduced to establish

12   permissible inferences that were essential to the prosecution's theory. <u>See</u> <u>Jammal</u>, 926

13   F.2d at 919. These inferences include that Petitioner was part of a criminal street gang,

14   Petitioner's motive, and Petitioner's identity. <u>See</u> <u>Abel</u>, 469 U.S. at 49. The California

15   Court of Appeal decision denying this claim was not contrary to clearly established

16   Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief with

17   regard to this claim.

18       **B.      Claim Two: Instructional Error: Failure to Provide Jury Instruction**

19       Petitioner claims that the jury was not adequately instructed regarding the charge

20   of active participation in a criminal street gang when instructed with CALCRIM No. 1400.

21   (Pet. at 13.)

22               1.      State Decision

23       In the last reasoned decision denying Petitioner's claim, the appellate court

24   explained:

25   **INSTRUCTIONAL ERROR**

26   A. <u>Section 186.22, Subdivision (A)</u>

27       With respect to count III, the trial court instructed the jury in
     pertinent part, pursuant to CALCRIM No. 1400: "The defendants are
28   charged in Count III with participating in criminal street gang in violation of

Penal Code Section 186.22, Subdivision (a). To prove that a defendant is guilty of this crime, the People must prove that, first, the defendant actively participated in a criminal street gang; second, when the defendant participated in the gang, he knew that members of the gang engaged in or have engaged in a pattern of criminal gang activity; and, third, the defendant willfully assisted, furthered or promoted felonious criminal conduct by members of the gang either by directly and actively committing a felony offense or by aiding and abetting a felony offense." Appellants now contend the instruction inadequately informed jurors that it must be shown beyond a reasonable doubt that the crime was gang-related.**[FN22]**

> **FN22**. Appellants seem to treat subdivision (a) of section 186.22 -- the substantive offense for which CALCRIM No. 1400 is the applicable instruction -- interchangeably with subdivision (b) of section 186.22 -- the enhancement for which CALCRIM No. 1401 (to which an objection was raised at trial) is the applicable instruction. The elements of the two are not identical. We interpret appellants' argument as going to CALCRIM No. 1400 and the substantive offense. Accordingly, we will not discuss CALCRIM No. 1401 and the enhancement contained in subdivision (b) of section 186.22.

> Section 186.22, subdivision (a) provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in *any* felonious criminal conduct by members of that gang," is guilty of a substantive offense. (Italics added.) In People v. Martinez (2008) 158 Cal.App.4th 1324, 1334 (Martinez), the appellate court rejected the identical challenge appellants now raise to CALCRIM No. 1400, stating:

> > "Defendant asserts this instruction was inadequate because it 'appears to apply to any offense in which it is shown that a gang member participated' and failed to instruct that the crime itself must be gang-related. Criticizing the title of the instruction itself, 'Active Participation in Criminal Street Gang,' he also maintains that the language of the instruction would not prevent the jury from reaching a guilty verdict based only on 'expert opinion on the ultimate issue' and the fact of gang membership itself.

> > "Defendant misapprehends the elements of the substantive crime of street terrorism. Contrary to what is required for an enhancement under section 186.22(b), section 186.22(a) does not require that the crime be for the benefit of the gang. Rather, it 'punishes active gang participation where the defendant promotes or assists in felonious conduct by the gang. It is a substantive offense whose gravamen is the participation in the gang itself.' [Citation.]

> > "The language of the instruction, which sets out the elements of the crime, dispels the claim that it is reasonably probable the jury would believe it could convict based on gang membership alone …."

> We find Martinez to be dispositive. Although in People v. Castenada

(2000) 23 Cal.4th 743 (upon which appellants rely), the California Supreme Court stated that "a person liable under section 186.22(a) must aid and abet a separate felony offense committed by gang members" (Castenada, at p. 750; see also id. at p. 752), we have previously observed that this statement is "often misinterpreted" (People v. Salcido (2007) 149 Cal.App.4th 356, 367). "When read in context … it is part of the Supreme Court's explanation that section 186.22, subdivision (a), avoids punishing mere association with a disfavored organization and satisfies the due process requirement of personal guilt [citation] by criminalizing gang membership only where the defendant bears individual culpability for 'a separate felony offense committed by gang members.' [Citation.] In other words, because section 186.22, subdivision (a), 'limits liability to those who promote, further, or assist a specific felony committed by gang members and who know of the gang's pattern of criminal gang activity' [citation], anyone who violates the statute must be more than a passive gang associate. He or she '"would also … be criminally liable as an aider and abettor to [the] specific crime" committed by the gang's members….' [Citation.]" (People v. Salcido, supra, at p. 367.)

People v. Lamas (2007) 42 Cal.4th 516, which appellants also cite, is similarly unavailing: It addresses the interplay between section 186.22, subdivision (a) and misdemeanor firearms offenses that are elevated to felonies upon proof under that statute. As the California Supreme Court made clear, "The substantive offense defined in section 186.22(a) has three elements. Active participation in a criminal street gang, in the sense of participation that is more than nominal or passive, is the first element of the substantive offense defined in section 186.22(a). The second element is 'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,' and the third element is that the person 'willfully promotes, furthers, or assists in *any* felonious criminal conduct by members of that gang.' [Citation.]" (People v. Lamas, supra, at p. 523, italics added.)

Garcia v. Carey (9th Cir. 2005) 395 F.3d 1099, 1100-1101, 1103, which requires proof of intent to promote, further, or assist in other criminal activity of the gang apart from the crime of conviction, deals with the enhancement under section 186.22, subdivision (b), and not with the substantive crime contained in section 186.22, subdivision (a). Moreover, the case misinterprets the California statute, which, by its plain and unambiguous language, requires a showing of specific intent to promote, further, or assist in "*any* criminal conduct by gang members …." (Italics added.) Accordingly, appellants' reliance thereon does not assist them.

People v. Martinez, 2009 Cal. App. Unpub. LEXIS 10039 at 85-90.

> ## 2. General Principles Regarding Trial Error In Instructing Jurors

This Court's review of Petitioner's claim of state instructional error is "limited to deciding whether [his] conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991); 28 U.S.C. § 2241. In order to grant federal habeas relief on the basis of faulty jury instructions, the Court must first conclude that the alleged error was of constitutional magnitude. See California v. Roy, 519 U.S. 2

1   (1996).

2       In order to grant federal habeas relief on the basis of faulty jury instructions, the

3   Court must conclude that the alleged error "had substantial and injurious effect or

4   influence in determining the jury's verdict." <u>Roy</u>, 519 U.S. at 5; <u>Brecht</u>, 507 U.S. at 637.

5   Federal habeas relief is warranted only if the Court, after reviewing the record, has

6   "grave doubt" as to the error's effect. <u>Stanton v. Benzler</u>, 146 F.3d 726, 728 (9th Cir.

7   1998). "The burden of demonstrating that an erroneous instruction was so prejudicial

8   that it will support a collateral attack on the constitutional validity of a state court's

9   judgment is even greater than the showing required to establish plain error on direct

10  appeal." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977). The trial court's error in omitting

11  a jury instruction is less likely to be prejudicial than the trial court's misstatement of the

12  law. <u>Henderson</u>, 431 U.S. at 155; <u>see also</u> <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th

13  Cir. 1997) (habeas petitioner whose claim involves a failure to give a particular

14  instruction bears an especially heavy burden).

15      To evaluate the effect of jury instructions, the Court must look at the context of the

16  entire trial and overall charge to the jury. <u>Estelle</u>, 502 U.S. at 72; <u>Prantil v. California</u>, 843

17  F.2d 314, 317 (9th Cir. 1988). They may not be judged in artificial isolation. <u>Estelle</u>, 502

18  U.S. at 72. In addition, a reviewing court's principal constitutional inquiry is whether

19  there is a reasonable likelihood that the jury applied the challenged instructions in a way

20  that violates the Constitution. <u>See</u> <u>id.</u>

21      While a state is generally free to define the elements of an offense, once the state

22  has defined the elements, due process requires that the jury be instructed on each

23  element and instructed that they must find each element beyond a reasonable doubt.

24  <u>Francis v. Franklin</u>, 471 U.S. 307, 313 (1985); <u>In re Winship</u>, 397 U.S. 358, 364 (1970);

25  <u>United States v. Perez</u>, 116 F.3d 840, 847 (9th Cir. 1997); <u>Stanton</u>, 146 F.3d at 728. Due

26  process requires that the jury be instructed on each element of the offense. <u>Keating v.</u>

27  <u>Hood</u>, 191 F.3d 1053, 1061 (9th Cir. 1991); <u>Stanton</u>, 146 F.3d at 728 (9th Cir. 1998).

28      It necessarily follows, therefore, that constitutional trial error occurs when a jury

1   makes a guilty determination on a charged offense without a finding as to each element

2   of the offense. According to the Supreme Court, a jury instruction that omits an element

3   of the offense constitutes such an error. <u>Neder v. United States</u>, 527 U.S. 1, 8 (1999).

4   However, such an error "does not necessarily render a criminal trial fundamentally unfair

5   or an unreliable vehicle for determining guilt or innocence." <u>Id.</u> at 9. Provided that such

6   an error occurred, Petitioner's conviction can only be set aside if the error was not

7   harmless under <u>Chapman v. California</u>, 386 U.S. 18 (1967); <u>Neder</u>, 527 U.S. at 15.

8   Under the <u>Chapman</u> harmless error test, it must be determined "beyond a reasonable

9   doubt" whether "the error complained of did not contribute to the verdict obtained."

10  <u>Chapman</u>, 386 U.S. at 24.

11          3.    <u>Analysis</u>

12          Here, Petitioner contends the trial court erred in failing to instruct the jury on the

13  elements of the charge of active participation in a street gang. The California Supreme

14  Court has explained that the gravamen of a violation of Penal Code section 186.22(a) "is

15  active participation in a street gang." <u>People v. Albillar</u>, 51 Cal. 4th 47, 55, 119 Cal. Rptr.

16  3d 415, 244 P.3d 1062 (2010). The elements of the offense are: (1) active participation

17  in a criminal street gang, in the sense of participation that is more than nominal or

18  passive; (2) knowledge that the gang's members engage in or have engaged in a pattern

19  of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any

20  felonious criminal conduct by members of that gang. <u>People v. Lamas</u>, 42 Cal. 4th 516,

21  523, 67 Cal. Rptr. 3d 179, 169 P.3d 102 (2007). "All three elements can be satisfied

22  without proof" that the promoted crime was gang-related. <u>Albillar</u>, 51 Cal. 4th at 56. The

23  state supreme court's "authoritative interpretation of section 186.22" must be applied by

24  this Court. <u>Emery v. Clark</u>, 643 F.3d 1210, 1215-16 (9th Cir. 2011) ("<u>Emery II</u>").

25          Until recently, the interpretation of this statute on habeas review in the Ninth

26  Circuit was in flux. In <u>Emery v. Clark</u>, 604 F.3d 1102 (9th Cir. 2010) ("<u>Emery I</u>"), the

27  Ninth Circuit certified a series of questions to the state supreme court regarding the

28  specific intent requirement under another provision of section 186.22. The California

Supreme Court decision in <u>Albillar</u> addressed the elements of the substantive gang participation offense (section 186.22(a)) and a gang activity enhancement (section 186.22(b)(1)). The <u>Albillar</u> Court expressly noted that its decision conflicted with various Ninth Circuit panels.

The <u>Albillar</u> decision did not answer the specific questions listed in <u>Emery I</u>. Nevertheless, the <u>Emery II</u> Court acknowledged that the state court definitively resolved the elements and mental intent necessary to commit the substantive offense of active street gang participation.

Here, the jury was correctly instructed on the elements of the charge. Furthermore, the state court in denying Petitioner's claim, specifically found that the instruction was correct. Consequently, the Court finds that the jury instructions provided by the state court did not render Petitioner's trial fundamentally unfair or violate his due process rights. Accordingly, the Court cannot find the Court of Appeal's rejection of Petitioner's claim to be unreasonable. <u>See</u> 28 U.S.C. § 2254(d). Petitioner is thus not entitled to federal habeas relief on his instructional error claim.

**C.     Claim Three: Involuntary Waiver of Miranda Rights**

In his third claim, Petitioner contends that his Miranda rights were violated based on continued questioning after he invoked his right to an attorney.  (Pet. at 5.)

1.     <u>State Decision</u>

In the last reasoned decision denying Petitioner's claim, the appellate court explained:

ADMISSION OF APPELLANTS' CONFESSIONS

Appellants both contend their confessions were wrongly admitted, and that the error requires reversal. Each says his confession was obtained in violation of the rules laid down in <u>Miranda v. Arizona</u> (1966) 384 U.S. 436 (<u>Miranda</u>) and its progeny. Lopez further contends his confession was coerced.

A. Applicable Legal Principles

The Fifth Amendment to the United States Constitution guarantees that a suspect in a criminal case "may not be compelled to be a witness against himself in any respect." (<u>Colorado v. Spring</u> (1987) 479 U.S. 564,

574.) "To protect the Fifth Amendment privilege against self-incrimination, a person undergoing a custodial interrogation must first be advised of his right to remain silent, to the presence of counsel, and to appointed counsel, if indigent. [Citation.] As long as the suspect knowingly and intelligently waives these rights, the police are free to interrogate him. [Citation.]" (People v. Stitely (2005) 35 Cal.4th 514, 535.)

"No particular manner or form of Miranda waiver is required, and a waiver may be implied from a defendant's words and actions. [Citations.]" (People v. Davis (2009) 46 Cal.4th 539, 585.) The waiver inquiry has two aspects. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude the Miranda rights have been waived. [Citations.]" (Moran v. Burbine (1986) 475 U.S. 412, 421.) The totality of the circumstances include "the particular background, experience and conduct of the accused. [Citation.]" (People v. Davis, supra, 46 Cal.4th at p. 586.)

"Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." (Moran v. Burbine, supra, 475 U.S. at pp. 422-423, fn. omitted.) If, however, "the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the produce of compulsion, subtle or otherwise." (Miranda, supra, 384 U.S. at pp. 473-474, fn. omitted.)

In Edwards v. Arizona (1981) 451 U.S. 477, 484-485 (Edwards), the United States Supreme Court "announced a related rule designed to prevent the 'badgering' of a criminal suspect by a law enforcement officer in order to get the suspect to waive his or her rights under Miranda [citations]: '[A]n accused, … having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him' [citations] and indeed not until counsel is actually present [citation], 'unless the accused himself initiates further communication, exchanges, or conversations with the police' [citations]." (People v. Neal (2003) 31 Cal.4th 63, 80.) "This 'rigid' prophylactic rule [citation] embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. [Citations.] Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. [Citation.]" (Smith v. Illinois (1984) 469 U.S. 91, 95.)

"[N]o particular form of words or conduct is necessary on the part of a suspect in order to invoke his or her right to remain silent [citation], and the suspect may invoke this right by any words or conduct reasonably

inconsistent with a present willingness to discuss the case freely and completely. [Citation.]" (<u>People v. Crittenden</u> (1994) 9 Cal.4th 83, 129.) Whether a suspect has invoked his or her right to counsel "is an objective inquiry. [Citation.] Invocation of the <u>Miranda</u> right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' [Citation.] But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, [United States Supreme Court] precedents do not require the cessation of questioning. [Citation.] [P] Rather, the suspect must unambiguously request counsel…. Although a suspect need not 'speak with the discrimination of an Oxford don,' [citation] he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect. [Citation.]" (<u>Davis v. United States</u> (1994) 512 U.S. 452, 459.)

"If a suspect's request for counsel or invocation of the right to remain silent is ambiguous, the police may 'continue talking with him for the limited purpose of clarifying whether he is waiving or invoking those rights.' [Citations.]" (<u>People v. Box</u> (2000) 23 Cal.4th 1153, 1194.) However, "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver." (<u>Smith v. Illinois</u>, supra, 469 U.S. at p. 100.) Where an accused has invoked his or her rights, he or she "'"initiates"' further communication, exchanges, or conversations of the requisite nature 'when he speaks words or engages in conduct that can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation."' [Citations.] 'In the event he does in fact "initiate"' such further communication, exchanges, or conversations, 'the police may commence interrogation if he validly waives his [<u>Miranda</u>] rights.' [Citations.]" (<u>People v. Waidla</u> (2000) 22 Cal.4th 690, 727-728.)

Statements obtained in violation of the foregoing rules are inadmissible to prove guilt. (<u>People v. Stitely</u>, supra, 35 Cal.4th at p. 535.) "In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under <u>Miranda</u> …, we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. [Citation.] Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we '"give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.' [Citations.]" (<u>People v. Wash</u> (1993) 6 Cal.4th 215, 235-236.)

The process on appeal is similar when a question of voluntariness is raised. "A defendant's admission or confession challenged as involuntary may not be introduced into evidence at trial unless the prosecution proves by a preponderance of the evidence that it was voluntary. [Citations.] A confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police

activity. [Citations.]" (People v. Williams (1997) 16 Cal.4th 635, 659.)

The due process (voluntariness) test -- which also applies to a determination of the voluntariness of a Miranda waiver (Colorado v. Connelly (1986) 479 U.S. 157, 169-170) -- "'examines "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession.' [Citation.]" (People v. Guerra (2006) 37 Cal.4th 1067, 1093, disapproved on other grounds in People v. Rundle (2008) 43 Cal.4th 76, 151.) "Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' [Citations.]" (People v. Neal, supra, 31 Cal.4th at p. 79.) Thus, we must consider "'"both the characteristics of the accused and the details of the interrogation"' [citations]" (People v. Guerra, supra, 37 Cal.4th at p. 1093), including "'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' [Citation.]" (People v. Williams, supra, 16 Cal.4th at p. 660.)

"On appeal, we review independently the trial court's determination on the ultimate legal issue of voluntariness. [Citation.] But any factual findings by the trial court as to the circumstances surrounding an admission or confession, including '"the characteristics of the accused and the details of the interrogation" [citation],' are subject to review under the deferential substantial evidence standard. [Citation.]" (People v. Williams, supra, 16 Cal.4th at pp. 659-660.) Where, as here, the interview was recorded, the facts surrounding the giving of the statement are undisputed; hence, we may independently review the trial court's determination of voluntariness. (People v. McWhorter (2009) 47 Cal.4th 318, 346.)

B. Martinez's Statement

1. The interview and trial court proceedings

At trial, Martinez claimed he invoked his right to counsel after being read his rights; hence, questioning should have ceased at that point. The prosecutor argued that the exchange between Martinez and Detective Navarro (the interviewing officer) had to be considered in context, and that Navarro used no words or conduct intended to elicit an incriminating response.

The trial court read the transcript of the interview, as have we. The transcript shows that upon entering what we assume was an interview room at the sheriff's department, Navarro uncuffed one of Martinez's hands, got him some water, and made sure that he was all right. Navarro then introduced himself and asked Martinez's name, date of birth, and address. He informed Martinez that he wanted to talk to him about the shooting, and that he had already talked to some of the people who were around. Navarro said he needed to advise Martinez of his rights before they talked, but that Navarro really wanted to get Martinez's side of the story, and that he only had one side of the story at that point, from the Surenos across the street. This ensued:

"Navarro: I really want to talk to you OK. So listen up. You have the right to remain silent. Anything you say can

29

and will be used against you in a court of law. You have the right to talk to an attorney and have them present before and during questioning. If you can not afford to hire an attorney, an attorney will represent you free of charge if you want. Do you understand your rights …?

"Martinez: Uh yeah.

"Navarro: OK. Do you want to tell me your side of the story? The honest one? I mean truthful.

"Martinez: I can have an attorney?

"Navarro: You want an attorney?

"Martinez: I don't I mean I don't know much about the system and I don't

"Navarro: Yeah. So you'd rather not talk to me then?

"Martinez: I would like to have an attorney.

"Navarro: OK. Do you have an attorney?

"Martinez: At least one present.

"Navarro: Uh hmm. Do you have an attorney?

"Martinez: Uh yeah.

"Navarro: Who's that?

"Martinez: Percy.

"Navarro: Percy. Oh, I know Percy. OK. Have you talked to him?

"Martinez: Naw, I haven't.

"Navarro: OK. So you'll talk to me but with an attorney present?

"Martinez: Yeah (unintelligible) cuz I don't know much about the law.

"Navarro: OK.

"Martinez: You know so.

"Navarro: Alright. What's your father's name?

"Martinez: My dad?

"Navarro: Uh hmm.

"Martinez: His name's Anthony.

1    "Navarro: Anthony too?

2    "Martinez: Yeah.

3    "Navarro: He's senior?

4    "Martinez: Uh naw.

5    "Navarro: Just Anthony Martinez?

6    "Martinez: Yeah well he has different middle name?

7    "Navarro: What's his what's his middle name?

8    "Martinez:  Valdez

9    "Navarro: Valdez. Alright.

10   "Martinez: Alright. I'm willing to talk to you guys uh but
      just I would like to have an attorney present. That's it.
11

12   "Navarro: Yeah, I don't know if we could get a hold of
      him right now. **[fn11]**

13   "Martinez: Yeah.

14   "Navarro: All I wanted was your side of the story.
      That's it. OK. So, I'm pretty much done with you then. Um, I
15   guess I don't know another option but to go ahead and book
      you. OK. Because
16

17   "Martinez: What am I being booked under?

18   "Navarro: Your [sic] going to be booked for murder
      because I only got one side of the story. OK.

19   "Martinez: But how how's he going to go about that. If
      we talk, once you get a hold of my uh attorney.
20

21   "Navarro: That's the thing, I don't know when were
      [sic] going to get a hold of him. Maybe I don't when he's
22   going I don't know when your [sic] going to call him.

23   "Martinez: I have to get a hold of him.

24   "Navarro: Huh?

25   "Martinez: I have to get a hold of him?

26   "Navarro: Yeah.

27   "Martinez: You guys don't (unintelligible)

28   "Navarro: No. No, your [sic] going to have to call him
      and it's going to have to be from jail.

"Martinez: Psss fuck.

"Navarro: OK. You want anymore water? You OK?

"Martinez: Naw. I'm fuckin' I don't know I'm cool. I don't know (unintelligible) murder see what I mean.

"Navarro: Yeah. Right. It has to be that way.

"Martinez: What did you want to tell me?

"Navarro: Huh?

"Martinez: What did you want to talk to me about?

"Navarro: About the shooting.

"Martinez: Lets [sic] talk shit, I'm cool.

"Navarro: Do you want the attorney or you don't care? I mean do you. It's up to you bro. I mean I just want to talk to you about it. Get your side of the story.

"Martinez: I mean I know you understand I ain't trying to go just

"Navarro: I know.

"Martinez: Booked under that you know what I mean?

"Navarro: Hold on OK. You want anymore water or your [sic] OK?

"Martinez: Uh, yeah go ahead and give me another cup[.] [P] … [P]

"Navarro: So what do you want to do? I mean we'll sit down and talk if you want. It's going to be up to you. I'm gonna leave it to you. Gonna be up to you. I want to I mean like I told you I just want your side of the story. That's it Daniel. OK. You don't look like a bad person. Alright, but I need to talk to you. But you don't have to though. It's up to you.

"Martinez: I just you know I'm tired of going back and forth to jail. And if that's the charge I mean you go, you don't get the choice to go back and forth you know so.

"Navarro: Uh hmm. It's up to you. Do you want to talk or you want me to sit down?

"Martinez: Yeah. I mean I'm willing to talk to you, you know what I mean but

"Navarro: With the truth?

"Martinez: Shit, if that's what helps me walk away.

"Navarro: Your [sic] young man. Just be honest.

"Martinez: Honest, the truth I'm just trying to go through this and be able to walk home and

"Navarro: So do you want to talk to me so I could sit down or what do you want to do?

"Martinez: Yeah.

"Navarro: Yeah. OK. You don't you don't want Percy then right now? Right? You don't want Percy?

"Martinez: Well, if I I mean

"Navarro: You don't you don't want an attorney right now? Your [sic] willing to talk to me right now? I want to clarify that.

"Martinez: Yeah.

"Navarro: OK.

"Martinez: I'm willing."

**FN11**: According to the transcript, the interview commenced at 7:00 p.m.

The trial court concluded that Navarro treated Martinez's invocation of his right to counsel as such, but then clarified for Martinez that -- contrary to Martinez's apparent misperception -- there was no attorney standing by. The court found that Martinez then voluntarily changed his mind. Accordingly, the court concluded that Martinez voluntarily waived his rights.

2. Analysis

Martinez now says his waiver of rights was involuntary, and hence his statement should have been excluded, because Navarro misled him about the availability of appointed counsel. Martinez says he was told he would have to get his own attorney, and would have to do so from jail.

When we consider the entirety of the exchange between Martinez and Navarro, we conclude the trial court properly ruled Martinez's statement was admissible. This was not a situation in which the suspect had no attorney or needed one appointed and was left to his own devices to obtain one as best he could. Instead, Martinez already had an attorney, and the problem was getting in touch with the attorney at the time of the interview, which was after normal business hours.

In our view, once Navarro clarified that Martinez was willing to talk to him, but wanted an attorney present, interrogation ceased. The questions Navarro asked concerning Martinez's father did not constitute

interrogation: Focusing primarily on Martinez's perceptions, they were not "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police [should have known were] reasonably likely to elicit an incriminating response from the suspect." (Rhode Island v. Innis (1980) 446 U.S. 291, 301, fns. omitted; People v. Huggins (2006) 38 Cal.4th 175, 198.)

It was Martinez who then turned the subject back to having an attorney present; we see nothing deceptive or coercive in Navarro's response that he did not know if they could get hold of Martinez's attorney then and that he had no option but to book Martinez. Martinez continued to inquire of Navarro; his question about what he was being booked for, "[a]lthough ambiguous, … evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation." (Oregon v. Bradshaw (1983) 462 U.S. 1039, 1045-1046 [no violation of Edwards rule where suspect asked what was going to happen to him].)

There was nothing inappropriate or misleading in Navarro's telling Martinez that Martinez would have to call his lawyer from jail. "Miranda does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one. The Court in Miranda emphasized that it was not suggesting that 'each police station must have a "station house lawyer" present at all times to advise prisoners.' [Citation.] If the police cannot provide appointed counsel, Miranda requires only that the police not question a suspect unless he waives his right to counsel. [Citation.]" (Duckworth v. Egan (1989) 492 U.S. 195, 204, fn. omitted [no Miranda violation where suspect informed, inter alia, that attorney would be appointed if and when suspect went to court]; see People v. Simons (2007) 155 Cal.App.4th 948, 955-959.) After Martinez asked what Navarro wanted to talk about, Navarro proceeded to make certain that Martinez was waiving his right to counsel and did not want to have an attorney, or his attorney, present. (See People v. Hart (1999) 20 Cal.4th 546, 643; People v. Simons, supra, 155 Cal.App.4th at p. 958.)

People v. Martinez, 2009 Cal. App. Unpub. LEXIS 10039, 19-35 (Cal. App. 5th Dist. Dec. 18, 2009).

## 2.   Legal Standard

In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything

34

1  stated can be used in evidence against him or her. Id. at 473-74. Once Miranda

2  warnings have been given, if a suspect makes a clear and unambiguous statement

3  invoking his constitutional rights, "all questioning must cease." Smith v. Illinois, 469 U.S.

4  91, 98, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984).

5  Edwards v. Arizona added a second layer of protection to the Miranda rules,

6  holding that "when an accused has invoked his right to have counsel present during

7  custodial interrogation, a valid waiver of that right cannot be established by showing only

8  that he responded to further police-initiated custodial interrogation even if he has been

9  advised of his rights." Edwards v. Arizona, 451 U.S. 477, 484 (1981) ("[A]n accused…

10  having expressed his desire to deal with the police only through counsel, is not subject

11  to further interrogation by the authorities until counsel has been made available to him,

12  unless the accused himself initiates further communication, exchanges, or conversations

13  with the police."); Michigan v. Harvey, 494 U.S. 344, 350 (1990).

14  In Arizona v. Roberson, the Supreme Court elaborated regarding the protections

15  under Edwards:

16  In Edwards, we "reconfirm[ed] these views and, to lend them
   substance, emphasize[d] that it is inconsistent with Miranda and its
17  progeny for the authorities, at their instance, to reinterrogate an accused
   in custody if he has clearly asserted his right to counsel." 451 U.S. at 485.
18  We concluded that reinterrogation may only occur if "the accused himself
   initiates further communication, exchanges, or conversations with the
19  police." Ibid. Thus, the prophylactic protections that the Miranda warnings
   provide to counteract the "inherently compelling pressures" of custodial
20  interrogation and to "permit a full opportunity to exercise the privilege
   against self-incrimination," 384 U.S. at 467, are implemented by the
21  application of the Edwards corollary that if a suspect believes that he is
   not capable of undergoing such questioning without advice of counsel,
22  then it is presumed that any subsequent waiver that has come at the
   authorities' behest, and not at the suspect's own instigation, is itself the
23  product of the "inherently compelling pressures" and not the purely
   voluntary choice of the suspect. As Justice White has explained, "the
24  accused having expressed his own view that he is not competent to deal
   with the authorities without legal advice, a later decision at the authorities'
25  insistence to make a statement without counsel's presence may properly
   be viewed with skepticism." Michigan v. Mosley, 423 U.S. 96, 110, n. 2, 46
26  L. Ed. 2d 313, 96 S. Ct. 321 (1975) (concurring in result).

27  Arizona v. Roberson, 486 U.S. 675, 680-681 (1988).

28  The Ninth circuit has similarly held:

35

1

2

3

4

5

6

7

Where the initial request to stop the questioning is clear, "the police may not create ambiguity in a defendant's desire by continuing to question him or her about it." Barrett, 479 U.S. at 535 n.5 (Brennan, J., concurring). By parsing Anderson's invocation into specific subjects, "the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." Mosley, 423 U.S. at 105-06. The net result is that such follow-up questions allowed the officer to avoid honoring the Fifth Amendment and, as in a right to counsel situation, enabled "the authorities through 'badger[ing]' or 'overreaching'--explicit or subtle, deliberate or unintentional--[to] wear down the accused and persuade him to incriminate himself." Smith, 469 U.S. at 98.

8    Anderson v. Terhune, 516 F.3d 781, 790 (9th Cir. 2008) (en banc).

9              3.    Analysis

10   Here, the state court found that once Petitioner requested an attorney,

11   interrogation ceased. It further found that the questions asked after invoking his right to

12   an attorney, specifically regarding the attorney and Petitioner's father did not constitute

13   interrogation. It also found the statements regarding how the officer was to then book

14   Petitioner were not deceptive or coercive. The state court held that Petitioner reinitiated

15   the conversation by asking what he was being booked for and eventually waiving his

16   right for counsel.

17   Accordingly, the issue is whether Petitioner initiated the exchange that ultimately

18   led to his waving his right to counsel that he had invoked just moments before. With

19   regard to this inquiry, the Court notes that the conversation could be interpreted in

20   multiple ways. For example, the transcript indicates that the conversation continued after

21   the invocation of his right to counsel, and a fair-minded jurist could find that the officer

22   continued to interrogate Petitioner with the hope that Petitioner would waive his rights if

23   further questioned. In that respect, the officer's statements that he was going to book

24   Petitioner because he did not tell his side of the story, in conjunction with Petitioner's

25   responses that he was willing to talk if it would help him walk away, indicate that the

26   officer may have used the coercive pressure of booking Petitioner in jail to obtain a

27   waiver of his right to counsel.

28   Alternatively, the state court's determination is equally plausible. As noted, the

officer's questions regarding the identity of Petitioner's attorney and information regarding Petitioner's father, are questions rationally related to the general investigation and are not likely to elicit an incriminating response by Petitioner. Further, telling Petitioner that if the interrogation were over, he would be booked is informative in nature, and likewise may not be considered as interrogation.[1]

Under the deferential review created under AEDPA, Petitioner is not entitled to relief. Fairminded jurists could disagree whether the state court's finding that Petitioner waived his right to counsel is inconsistent with the Supreme Court's holdings in Miranda, Edwards, and their progeny.  The state court's ruling was not so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. Richter at 786-87.

While the Court recommends the claim be denied, "jurists of reason could disagree with the district court's resolution of his constitutional claims, they could "conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 123 S.Ct. 1029, 1034 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, the Court further recommends that a certificate of appealability be issued with respect to this claim. Petitioner is forewarned that the issuance of a certificate of appealability does not relieve Petitioner of his duty to file and perfect his appeal, should he choose to do so.

**D.   Claim Four: Admission of Autopsy Report**

Petitioner contends that his rights under the confrontation clause were violated by the court allowing a pathologist who did not perform the autopsy to present evidence from the autopsy report of the pathologist who did do the autopsy. (Pet. at 5, 14.)

1.   State Decision

---

[1] The court notes that the officer did more here than just inform Petitioner that he was going to be booked. The officer's statements that "All I wanted was your side of the story… I guess I don't know another option but to go ahead and book you," and "Your [sic] going to be booked for murder because I only got one side of the story." create the potential implication that if Petitioner was to talk then he might not be booked, and therefore could be considered further interrogation.

In the last reasoned decision denying Petitioner's claim, the appellate court explained:

### C. Admission of Autopsy Report and Related Testimony

Dr. Pakdaman performed the autopsy in this case. According to the prosecutor, he was out of the country and so unavailable to testify at trial. As a result, the prosecutor called Dr. Lawrence, Dr. Pakdaman's supervisor, as a witness. As Lawrence neither performed nor was present during the autopsy, appellants objected to admission of his testimony, and Pakdaman's report, on confrontation clause grounds. The objections were overruled. Lawrence, who stated that he had watched Pakdaman conduct autopsies, and had read many of his reports and never found errors in Pakdaman's determination of cause of death, testified concerning the results of Jefte's autopsy based on Pakdaman's report thereof and photographs taken during the procedure. In part, Lawrence testified that the paths of the projectiles in both the arm and the eye were straight front to back; that the cause of death was gunshot wound to the brain; and that Jefte would have been rendered immediately unconscious when the gunshot entered his eye. In Lawrence's opinion, Jefte possibly could have taken a few steps, but would not have been capable of any purposeful activity. Lawrence concluded that Jefte was facing the weapon when shot.

Bolstered by a recent decision of the United States Supreme Court, appellants now repeat their Sixth Amendment claims. We need not decide whether error occurred, however, because we conclude it was harmless beyond a reasonable doubt in any event.

In People v. Geier (2007) 41 Cal.4th 555 (Geier), an expert testified to her opinion concerning a DNA match and its statistical significance, based on testing she did not personally conduct. (Id. at pp. 593-594.) The California Supreme Court concluded that such scientific evidence is not "testimonial" within the meaning of Crawford and Davis; instead, for purposes of admission of a DNA report, "a statement is testimonial if (1) it is made to a law enforcement officer or by or to a law enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial. Conversely, a statement that does not meet all three criteria is not testimonial." (Geier, supra, at p. 605.) The court emphasized that the observations of the person who actually conducted the testing and prepared the report "constitute a contemporaneous recordation of observable events rather than the documentation of past events. That is, she recorded her observations regarding the receipt of the DNA samples, her preparation of the samples for analysis, and the results of that analysis as she was actually performing those tasks. 'Therefore, when [she] made these observations, [she] -- like the declarant reporting an emergency in Davis -- [was] "not acting as [a] witness [ ];" and [was] "not testifying."' [Citation.]" (Geier, supra, at pp. 605-606.) As the court read Davis, "the crucial point is whether the statement represents the contemporaneous recordation of observable events." (Geier, supra, at p. 607.)

Recently, in Melendez-Diaz v. Massachusetts (2009) 557 U.S. [129 S.Ct. 2527] (Melendez-Diaz), the United States Supreme Court held that certificates reporting the results of forensic analysis (showing material seized by police and connected to the defendant was cocaine) were

"testimonial" under <u>Crawford</u>, and the analysts were "witnesses" for Sixth Amendment purposes. (<u>Melendez-Diaz</u>, supra, at pp. 2530, 2532.) The court found that the documents at issue clearly were affidavits; they were "incontrovertibly a '"solemn declaration or affirmation made for the purpose of establishing or proving some fact."' [Citations.] The fact in question is that the substance found in the possession of <u>Melendez-Diaz</u> and his codefendants was, as the prosecution claimed, cocaine -- the precise testimony the analysts would be expected to provide if called at trial. The 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' [Citation.] [P] Here, moreover, not only were the affidavits '"made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,"' [citation] but under Massachusetts law the sole purpose of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance [citation]." (<u>Id.</u> at p. 2532.)

The high court rejected the argument that there is a difference, for confrontation clause purposes, between testimony recounting historical events and testimony that is the result of neutral, scientific testimony, finding it "little more than an invitation to return to our overruled decision in" <u>Roberts</u>, supra, 448 U.S. 56. (<u>Melendez-Diaz</u>, supra, 129 S.Ct. at p. 2536.) The court also rejected the argument that the affidavits were admissible without confrontation because they were akin to official and business records: "Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. [Citation.] But that is not the case if the regularly conducted business activity is the production of evidence for use at trial." (<u>Id.</u> at p. 2538.) "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because -- having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial -- they are not testimonial. Whether or not they qualify as business or official records, the analysts' statements here -- prepared specifically for use at [<u>Melendez-Diaz's</u>] trial -- were testimony against [him], and the analysts were subject to confrontation under the Sixth Amendment." (<u>Id.</u> at pp. 2539-2540.)

California's intermediate courts have come to differing conclusions concerning <u>Geier</u>'s continuing viability following <u>Melendez-Diaz</u> and the California Supreme Court recently granted review in a number of cases in order to address the issue. (<u>People v. Rutterschmidt</u> (2009) 176 Cal.App.4th 1047, review granted Dec. 2, 2009, S176213; <u>People v. Dungo</u> (2009) 176 Cal.App.4th 1388, review granted Dec. 2, 2009, S176886; <u>People v. Lopez</u> (2009) 177 Cal.App.4th 202, review granted Dec. 2, 2009, S177046; <u>People v. Gutierrez</u> (2009) 177 Cal.App.4th 654, review granted Dec. 2, 2009, S176620.) We need not take sides in this debate at this point -- or, for that matter, offer our opinion concerning the continued vitality of cases such as <u>People v. Clark</u> (1992) 3 Cal.4th 41, 158-159 and <u>People v. Beeler</u> (1995) 9 Cal.4th 953, 979-980, which deal with one physician testifying about the report of the physician who actually conducted the autopsy, and admission of that report as a public or business record -- because any error did not prejudice appellants.

"Confrontation clause violations are subject to federal harmless-error analysis under <u>Chapman v. California</u> (1967) 386 U.S. 18, 24 [(<u>Chapman</u>)]. [Citation.]" (<u>Geier</u>, supra, 41 Cal.4th at p. 608.) The question

is whether we can find, beyond a reasonable doubt, "that the jury verdict would have been the same error. [Citations.]"; People v. Harrison (2005) 35 Cal.4th 208, 239.)

The answer here is yes. The People presented evidence, through Manivong's testimony, that Lopez shot at the individual with the shirt off. Deputy Alves testified to finding a body at the scene with a gunshot wound to the arm and one to the eye. Detective Hatfield testified to finding an identification card belonging to the victim inside a bedroom at 1310 Alamo. Ms. Estrada testified that Jefte was killed. This was sufficient to establish the corpus delicti independent of appellants' statements. (See People v. Crew (2003) 31 Cal.4th 822, 836-837; People v. Moreno (1987) 188 Cal.App.3d 1179, 1187.) Appellants did not dispute that Jefte Garcia's life was terminated by a gunshot wound or, for that matter, that Lopez pulled the trigger. (See People v. Williams (1959) 174 Cal.App.2d 364, 391.) With respect to the shooting itself, the real questions were whether appellants acted in self-defense and, if not, the level of their culpability.

Significantly, Detective Copeland testified that he attended the autopsy of Jefte Garcia as part of his duties in investigating the shooting at 1310 Alamo on December 8, 2005; he was present when the photographs, which Dr. Lawrence reviewed and testified about, were taken, and when evidence was recovered from Jefte's body. Copeland testified there was a bullet wound to Jefte's right eye and an entry wound to his arm, and that he was present when probes were placed in the wounds to show the paths of the projectiles. He was also present when projectile fragments were recovered from Jefte's brain. Photographs of the probe placement and fragments were in evidence and, hence, available for jurors to view. Lawrence's testimony -- that the path of both projectiles was front to back, that Jefte was facing the shooter, and that the physical findings were inconsistent with someone running away or even turning away -- can only have been helpful to appellants, and in fact appellants argued this testimony to the jury to bolster their claims of self-defense and to attack the credibility of Sandoval and Manivong.

People v. Martinez, 2009 Cal. App. Unpub. LEXIS 10039, 60-68 (Cal. App. 5th Dist. Dec. 18, 2009).

2.   Analysis

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him." The Confrontation Clause prohibits the admission of testimonial out-of-court statements by non-testifying individuals. Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). When the prosecution introduces a forensic report that constitutes a testimonial statement, the analyst who produced the report must personally testify. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); Bullcoming v. New Mexico, 131 S. Ct. 2705, 2710, 180 L. Ed. 2d 610 (2011).

1  Confrontation Clause violations are subject to harmless error analysis under Chapman v.

2  California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Delaware v. Van Arsdall,

3  475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); United States v. Norwood,

4  603 F.3d 1063, 1067 (9th Cir. 2010).

5      Here, the state court determined that it did not need to reach the question

6  whether there had been Crawford error, because any such error would be harmless

7  even under the standard applicable to constitutional violations. The question before this

8  court is whether that analysis was objectively unreasonable. Fry v. Pliler, 551 U.S. 112,

9  119, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007) ("In Mitchell v. Esparza, 540 U.S. 12, 124

10  S. Ct. 7, 157 L. Ed. 2d 263 (2003) (per curiam), we held that, when a state court

11  determines that a constitutional violation is harmless, a federal court may not award

12  habeas relief under § 2254 unless the harmlessness determination itself was

13  unreasonable.") (emphasis in original).

14      The state court's decision to conduct harmless error analysis was entirely

15  consistent with federal law. See Van Arsdall, 475 U.S. at 684 (Confrontation Clause

16  violations are subject to harmless error analysis). Accordingly, regardless of the

17  egregiousness of the confrontation violation viewed in isolation, habeas relief is available

18  only if the state court's harmless error analysis was contrary to or an unreasonable

19  application of clearly established federal law.

20      The state court applied the correct standard: harmlessness beyond a reasonable

21  doubt pursuant to Chapman. See Van Arsdall, 475 U.S. at 684 (Chapman standard

22  applies). Accordingly, the state court adjudication was not contrary to federal law.

23      Neither was the harmless error analysis objectively unreasonable. The state court

24  was correct that the case against Petitioner was based on witness testimony from

25  Manivong that Petitioner's accomplice shot the victim, and that police detectives testified

26  based on personal knowledge regarding finding the body at the scene and observing the

27  autopsy. Pictures were also taken during the autopsy that supported the indication that

28  the bullets entered the victim front to back. Petitioner did not dispute that Lopez shot and

killed the victim. Further, Petitioner relied on the evidence from the autopsy to attempt to argue self-defense as the victim was shot as he was facing shooter, rather than showing that the victim was shot attempting to flee. Although Petitioner was not provided the opportunity to cross-examine the pathologist who performed the autopsy, the state court was reasonable in determining that even if Petitioner had had the opportunity to question the pathologist, the result of the trial would not have been different.

Accordingly, the state court's application of the <u>Chapman</u> standard was not objectively unreasonable and § 2254(d) precludes relief on this claim.

**E.      Claim Five: Exclusion of Sandoval's Sentence**

Petitioner contends that his rights under the confrontation clause were violated by the court's exclusion of evidence of the sentence Sandoval faced if he failed to testify. (Pet. at 6, 15.)

1.      State Decision

In the last reasoned decision denying Petitioner's claim, the appellate court explained:

**A. Exclusion of Kristian Sandoval's Potential Sentence**

On direct examination by the prosecutor, Sandoval testified that he was arrested on December 22, 2005. He was charged equally, by criminal complaint, with appellants. On October 22, 2007, he entered into a written agreement with the district attorney's office to testify in this case. Shortly thereafter, he was released from custody pursuant to the agreement, after having been incarcerated for almost two years. At the time of trial, he was still technically charged with murder; it was his understanding based on the agreement, however, that after testifying, he would be allowed to pled guilty to a violation of section 32, accessory after the fact, a felony. He would receive time served, which was, in essence, two years. The gist of the agreement was that he would tell the truth and answer all questions. Sandoval had never been convicted of a crime before, and had not been made any other promises, or provided any other benefit, involving his testimony, other than what was contained in the agreement.

On cross-examination, Lopez established that Sandoval was charged with first degree murder and attempted murder, each with gang and firearm-related penalty enhancements, and that if he testified in a way that satisfied the prosecutor, he would avoid going back to jail. No one would ask any more from him than the two years he had already served. This ensued:

"Q. [by Mr. Baker, Lopez's attorney] So exactly how much of

42

a benefit is that? Well, let me put it this way: Did your lawyer, Mr. Forkner, tell you how much time you would face if you were to go to trial and be convicted on all of those charges?

"MR. BRENNAN [prosecutor]: Judge, I object. This is attorney/client privilege.

"THE COURT: Sounds like it would be.

"MR. BAKER: Is to his perception of the value.

"THE COURT: Whichever it goes for, it sounds like it's privileged discussion between him and his attorney -- [P] … [P]

"MR. MILLER [Martinez's attorney]: … Perhaps we can revisit this issue on Tuesday. He'll still be on the stand, and Mr. Forkner will be here. [P] … [P] We can either do that, or I can request right now under … 452 and 451, Court has to take judicial notice what the maximum penalty is for each one of those, and if the Court takes judicial notice, the Court has to tell the jury … what they are.

"MR. BRENNAN: And also, … it is completely improper to put a sentence issue in front of the jury that is exactly they're trial to do. [Sic.]

"MR. MILLER: Showing likely bias.

"THE COURT: We can take this up another time. At this point I'm going to sustain the objection."

Cross-examination by Martinez elicited that one of the terms of the agreement was that Sandoval testify and tell the truth. When asked who decided if he was telling the truth, Sandoval replied that he did not know. Counsel then asked whether, if the prosecutor decided Sandoval was not telling the truth, the district attorney could revoke the agreement and try Sandoval for murder. Sandoval agreed that could happen. When counsel asked whether Sandoval would consider that a good incentive to testify to please the prosecutor, Sandoval responded no, but that he would take it as "tell the truth."

At the conclusion of his cross-examination, Martinez asked the court to return to its ruling on attorney-client privilege, and to permit the reopening of cross-examination depending on the court's decision on that issue. The prosecutor responded that Sandoval would make himself available if he were called back the following week, but asked to be permitted to conduct redirect examination right then. Insofar as the record shows, appellants never sought to recall Sandoval or obtain a further ruling on the matter.

Appellants now contend their confrontation rights were violated by the trial court's exclusion of evidence of the sentence faced by Sandoval should he fail to testify for the prosecution. We see no error.

The trial court properly determined that the question concerning

43

what Sandoval's lawyer told him ran afoul of the attorney-client privilege. (Evid. Code, § 954; see People v. Hayes (1999) 21 Cal.4th 1211, 1265; People v. Gionis (1995) 9 Cal.4th 1196, 1207.) Leaving aside for the moment the issue of placing the matter of punishment before the jury, appellants could have, but did not, simply ask Sandoval for his understanding of how much time he would face absent the agreement, without inquiring as to his conversations with his attorney. (See People v. Schmeck (2005) 37 Cal.4th 240, 278.) Lopez says that doing so "would have invited an account of  the attorney's advice, because without it the jury could not know what information Sandoval used to calculate the necessity of his testimony," but we disagree: In assessing Sandoval's bias and credibility, his understanding of the sentence he faced -- right or wrong -- was what mattered, not the basis for that understanding.

The trial court was also correct in implicitly refusing to take judicial notice, and inform the jury, of the maximum potential sentence faced by Sandoval. "[T]he proffered evidence would have informed the jury that appellant[s] could also expect to be sentenced to [life terms] if [they] were found guilty as charged. The harshness of this penalty might have caused some jurors to feel sympathy for appellant[s]. Yet, '[i]t is fundamental that the trier of fact, be it court or jury, must not consider the subject of penalty or punishment in arriving at its decision of guilt or innocence.' [Citation.]" (People v. Celis (2006) 141 Cal.App.4th 466, 477; see also People v. Alvarez (1996) 49 Cal.App.4th 679, 687.) Whether appellants appropriately might have elicited that Sandoval was facing a sentence of considerably longer than two years is not before us; they made no attempt to do so.

Nor were appellants denied their constitutional confrontation rights. The United States Supreme Court spoke to the Sixth Amendment issue in Delaware v. Van Arsdall (1986) 475 U.S. 673, 678-679:

"The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings [citation], 'means more than being allowed to confront the witness physically.' [Citation.] Indeed, '"[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination."' [Citations.] Of particular relevance here, '[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of  cross-examination.' [Citations.] It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant…. '[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and

1

to whatever extent, the defense might wish.' [Citation.]"

2

The Supreme Court determined that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors … could appropriately draw inferences relating to the reliability of the witness.' [Citation.]" (Delaware v. Van Arsdall, supra, 475 U.S. at p. 680.)

3

4

5

6

The California Supreme Court has similarly recognized that while defense counsel in a criminal action should be given wide latitude in cross-examining prosecution witnesses (People v. Murphy (1963) 59 Cal.2d 818, 830-831), the trial court may reasonably control such cross-examination, even with regard to motive and bias (see, e.g., People v. Belmontes (1988) 45 Cal.3d 744, 780-781, disapproved on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22; People v. Rodriguez (1986) 42 Cal.3d 730, 749-750; People v. Burgener (1986) 41 Cal.3d 505, 525-526, disapproved on other grounds in People v. Reyes (1998) 19 Cal.4th 743, 756). Thus, while a witness's credibility is always in issue and subject to challenge on cross-examination, "[t]here is no Sixth Amendment violation at all unless the prohibited cross-examination might reasonably have produced 'a significantly different impression of [the witness's] credibility ….'" (People v. Rodriguez, supra, 42 Cal.3d at p. 751, fn. 2, quoting Delaware v. Van Arsdall, supra, 475 U.S. at p. 680.)

7

8

9

10

11

12

13

14

In the present case, the jury was aware of the terms of Sandoval's agreement with the prosecution, and Sandoval was extensively and effectively cross-examined by defense counsel thereon. Significantly, jurors knew charges including first degree murder were still pending against him at the time he testified, and they also knew he expected to walk away and resume his life after only two years in custody. Jurors are not stupid; they did not need to know the precise sentence Sandoval faced in order to be aware he had a massive incentive to testify in a manner that benefited the prosecution. They had every opportunity to discount or disbelieve Sandoval's testimony, especially in light of the fact the trial court instructed them that Sandoval was an accomplice and an accomplice's testimony that tends to incriminate a defendant is to be viewed with caution. (See People v. DeSantis (1992) 2 Cal.4th 1198, 1220.) Under the circumstances, the prohibited cross-examination would not have produced a significantly different impression of Sandoval's credibility.

15

16

17

18

19

20

21

People v. Martinez, 2009 Cal. App. Unpub. LEXIS 10039, 44-52 (Cal. App. 5th Dist. Dec. 18, 2009).

22

23

2.   Standard

24

The "Confrontation Clause guarantees an opportunity for effective cross-

25

examination, not cross-examination that is effective in whatever way, and to whatever

26

extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292,

27

88 L. Ed. 2d 15 (1985) (per curiam). Accordingly, "trial judges retain wide latitude insofar

28

as the Confrontation Clause is concerned to impose reasonable limits on such cross-

1    examinations based on concerns about, among other things, harassment, prejudice,

2    confusion of the issues, the witness' safety, or interrogation that is repetitive or only

3    marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L.

4    Ed. 2d 674 (1986).

5         A court violates the "Confrontation Clause only when it prevents a defendant from

6    examining a particular and relevant topic." Fenenbock v. Director of Corrections, 692

7    F.3d 910, 919 (9th Cir. 2012). Indeed, a limitation on cross-examination that excludes

8    testimony on a particular topic might violate the rule that "[r]estrictions on a criminal

9    defendant's rights to confront adverse witnesses and to present evidence 'may not be

10   arbitrary or disproportionate to the purposes they are designed to serve.'" Michigan v.

11   Lucas, 500 U.S. 145, 151, 111 S. Ct. 1743, 114 L. Ed. 2d 205 (1991) (quoting Rock v.

12   Arkansas, 483 U.S. 44, 56, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987)).

13        A defendant meets his burden of showing a Confrontation Clause violation by

14   showing that "[a] reasonable jury might have received a significantly different impression

15   of [a witness'] credibility . . . had respondent's counsel been permitted to pursue his

16   proposed line of cross-examination." Van Arsdall, 475 U.S. at 680; Slovik v. Yates, 556

17   F.3d 747, 753 (9th Cir. 2009). The focus of this inquiry "must be on the particular

18   witness, not on the outcome of the entire trial," Van Arsdall, 475 U.S. at 680, such that

19   defense counsel's ability to impeach other witnesses "is irrelevant" to whether the trial

20   court violated the Confrontation Clause, Slovik, 556 F.3d at 754. A limitation on cross-

21   examination does not violate the Confrontation Clause unless it limits relevant testimony

22   and prejudices the defendant, and denies the jury sufficient information to appraise the

23   biases and motivations of the witness. United States v. Urena, 659 F. 3d 903, 907-08

24   (9th Cir. 2011).

25        3.    Analysis

26        In this case, the jury was made aware of Sandoval's agreement with the

27   prosecution, and Petitioner was allowed to cross-examine him. The jurors were made

28   aware that first degree murder charges were still pending against Sandoval, and that

1   those charges would be dropped if he met the conditions of the agreement. While the

2   jurors were not provided the potential duration of Sandoval's sentence should he have

3   been found guilty of murder, the state court determined that the jurors would reasonably

4   understand that Sandoval had a "massive incentive to testify in a manner that benefitted

5   the prosecution." People v. Martinez, 2009 Cal. App. Unpub. LEXIS 10039 at 44-52.

6   Accordingly, the state court found that the excluded testimony would not have produced

7   a significantly different impression of Sandoval's testimony.

8       The jury was presented the significant details regarding Sandoval and his

9   agreement with the prosecution. They knew that he was charged with first degree

10  murder with enhancements, but that if he cooperated would be released after two years

11  of time served. Although the jury was not provided the potential length of the murder

12  sentence, the state court was reasonable in determining that the prohibited cross-

13  examination would not significantly change the jury's determination of Sandoval's

14  credibility. The Court concludes that the state court opinion was not an unreasonable

15  application of Supreme Court authority. Accordingly, Petitioner is not entitled to habeas

16  relief on this claim.

17      **F.**   **Claim Six: Prosecutorial Misconduct**

18      Petitioner contends that the prosecution committed misconduct in arguing that

19  Petitioner was responsible for the sidewalk graffiti that instigated the confrontation. (Pet.

20  at 6, 15.)

21      1.   State Decision

22      In the last reasoned decision denying Petitioner's claim, the appellate court

23  explained:

24      **PROSECUTORIAL MISCONDUCT**

25          Appellants contend they were denied a fair trial by the prosecutor's
    argument that they were responsible for the tagging at Jefte's house.
26  Appellants concede the portion of the prosecutor's argument, in which he
    stated that the authors of the graffiti were members of the Nortenos
27  criminal street gang who were sending a message of ultimate disrespect
    to Jefte and the residents of his house, was reasonable. By blaming the
28  tagging specifically on appellants, however, the argument runs, the

prosecutor essentially told jurors it was the victims who were provoked, thereby effectively eliminating the defense claims of provocation, self-defense, and imperfect self-defense.

We consider the challenged portions of argument in context. Prior to the first one, the prosecutor was discussing Martinez and his contacts with law enforcement relative to gang participation and benefit. This ensued:

"Once, again, September 27, 2005, another Field Interview Card, wearing a red shirt, four days before the murder, December 4, 2005. This is the late night tagging event with Anthony Gonzales.

"Remember Anthony Gonzales? That's where Pablo Lopez is arrested on February 2nd, 2006, and Anthony Gonzales had tattoos, 'YGL' gang member.

"Well, Mr. Martinez is with these individuals, and they're tagging 'PLB,' see 'X4,' 'Parklawn Boyz, X4' four days before the murder.

"Again, don't look at this as a simple vandalism, a simple misdemeanor vandalism where a graffiti abatement officer for the County can come by and just brush it over and move on. We're talking about the mindset of gang members just prior to the murder of Jefte Garcia, the lifestyle of a gang member.

"Now, once again, this is all the three-part analysis. All of this occurred before the murder.

"Now, let's go to the facts as we heard them develop as what happened around 7:00 o'clock PM when the 'YGL, X4' and the line is being spray painted across it.

"You know, Jefte Garcia had the spray paint can, and he's spraying the horizontal line across 'YGL X4.' You know a horizontal line across a gang symbol is a lot different than taking a scrub brush and Ajax and washing it, washing it completely, maybe washing it off in the middle of the night where nobody sees you do it. Suddenly graffiti, going to paint over it like a graffiti abatement officer would do like paint simpler to sidewalk. (Sic.)

"What does Jefte Garcia do when he's disrespected? He responds like a gang member would, horizontal line through it.

"Now, at this point in time what do you know is happening? Daniel Martinez and Pablo Lopez are walking toward Kristian Sandoval's house.

"Choice No. 1, do you think it's a coincidence they just happen to be walking right into the confrontation, the confrontation that is simmering? This is a spark that is

1  igniting a powder keg, the same powder keg that exists any given street, any given day on the streets of Stanislaus County when rival gang members live in the same neighborhood.

2

3  "MR. MILLER: That's an improper argument. There's absolutely no evidence that either defendant had anything to do with any graffiti.

4

5  "MR. BRENNAN: If I can, please --

6  "THE COURT: It's within the bounds of argument. I'll allow it.

7  "MR. BRENNAN: So Jefte Garcia is wiping out with a horizontal line the sign and symbol of Daniel Martinez and Pablo Lopez's criminal street gang, 'YGL Nortenos.'"

8

9  The second purported incident of misconduct occurred during the prosecutor's discussion of the various enhancements that were alleged. The prosecutor stated:

10

11  "Again, because of gang crimes, when you have multiple participation, the law's not going to distinguish between shooter and non shooter when they share the same intent and they're going down that same path and committing the crime to benefit the gang.

12

13

14  "And I keep saying 'benefit.' Let's focus on that for a second. We know based on everything I've said over the past hour and a half, this is a gang crime, everything from how it started, to the tagging, to the cross out, to the acts of disrespect, first of all, the disrespecting Jair and Jefte Garcia on their house, second, the act of disrespect by crossing out the 'YGL X4,' two gang members walking into this arena. What are you going to do as gang member? Is a gang member going to say, Oh, no. There's a Sureno crossing out my tagging. We better run. We better show courtesy, we better back down?"

15

16

17

18

19

20  "The standards governing review of misconduct claims are settled. A prosecutor commits misconduct under the federal Constitution when his or her conduct infects the trial with such '"unfairness as to make the resulting conviction a denial of due process."' [Citations.] Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.] In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review. [Citation.]" (<u>People v. Hawthorne</u> (2009) 46 Cal.4th 67, 90; accord, <u>People v. Hill</u> (1998) 17 Cal.4th 800, 819.)

21

22

23

24

25

26

27  "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.]" (<u>People v. Frye</u> (1998) 18 Cal.4th 894,

28

970, disapproved on other grounds in <u>People v. Doolin</u>, supra, 45 Cal.4th at p. 421, fn. 22; accord, <u>People v. Clair</u> (1992) 2 Cal.4th 629, 663.) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (<u>People v. Frye</u>, supra, at p. 970.) Moreover, we keep in mind that "the prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the deductions are illogical because these are matters for the jury to determine. [Citations.] The prosecutor may not, however, argue facts or inferences not based on the evidence presented. [Citation.]" (<u>People v. Lewis</u> (1990) 50 Cal.3d 262, 283.)

We are not convinced it is reasonably likely jurors understood the prosecutor to assert that appellants personally were responsible for the tagging, as opposed to members of their gang.[fn23] There was no direct evidence of who was responsible, and there was testimony that both appellants denied being the tagger. In any event, we conclude the prosecutor neither assumed facts not in evidence nor mischaracterized the evidence, but instead drew inferences that were permissible. (<u>See People v. Tafoya</u> (2007) 42 Cal.4th 147, 181.) It reasonably could be inferred that the graffiti was fresh, or it would have already been removed or crossed out. YGL had only a few members, and two of them were not only in the immediate vicinity, but right across the street. One of the two (Martinez) had had previous conflicts with the Garcia brothers that inferably were gang-related, and had been involved in a tagging incident only four days earlier. There was no misconduct.

FN23: We assume, for the sake of discussion, that the trial court's overruling the objection to the first complained-of reference to the tagging rendered excusable, as futile, appellants' failure to object to the second reference.

<u>People v. Martinez</u>, 2009 Cal. App. Unpub. LEXIS 10039, 93-99 (Cal. App. 5th Dist. Dec. 18, 2009).

## 2.   <u>Applicable Legal Principles</u>

A criminal defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. <u>Parker v. Matthews</u>,   U.S.  , 132 S.Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (per curiam); <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted); <u>see also</u> <u>Greer v. Miller</u>, 483 U.S. 756, 765, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987); <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed.

1    2d 431 (1974); <u>Towery v. Schriro</u>, 641 F.3d 300, 306 (9th Cir. 2010). Relief on such

2    claims is limited to cases in which the petitioner can establish that prosecutorial

3    misconduct resulted in actual prejudice. <u>Darden</u>, 477 U.S. at 181-83. <u>See also</u> <u>Towery</u>,

4    641 F.3d at 307 ("When a state court has found a constitutional error to be harmless

5    beyond a reasonable doubt, a federal court may not grant habeas relief unless the state

6    court's determination is objectively unreasonable"). Prosecutorial misconduct violates

7    due process when it has a substantial and injurious effect or influence in determining the

8    jury's verdict. <u>See</u> <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th Cir. 1996).

9                              3.    <u>Analysis</u>

10         The California Court of Appeal held that the inferences made during the

11   prosecution's closing were permissible and did not mischaracterize the evidence. The

12   state court's determination was reasonable. As the state court explained, it was

13   reasonably likely that jurors, in hearing the prosecution's closing argument would

14   understand that the prosecution was implicating members of Petitioner's gang who were

15   responsible for the tagging, and not necessarily Petitioner himself. This court agrees. No

16   evidence was presented at trial that Petitioner was responsible for the tagging outside

17   the victim's house. Petitioner and his co-defendants denied being the taggers. However,

18   due to the small number of gang members, it was reasonable for the prosecution to

19   argue that the tagging was gang-related, that Petitioner was aware of the tagging, and

20   that the course of conduct of Petitioner and his fellow gang members served to instigate

21   the victim, a rival gang member, into the confrontation. The instance of misconduct about

22   which Petitioner complains was not so unfair as to constitute a due process violation.

23   <u>Towery v. Schriro</u>, 641 F.3d 300, 306 (9th Cir. 2010).

24         Certainly the decision of the state appellate court rejecting these claims of

25   prosecutorial misconduct is not "so lacking in justification that there was an error well

26   understood and comprehended in existing law beyond any possibility for fairminded

27   disagreement." <u>Richter</u>, 131 S. Ct. at 786-87. Accordingly, Petitioner is not entitled to

28   federal habeas relief on this claim.

1

**G.     Claim Seven: Challenges to Jury Instruction**

2

In his seventh and last claim, Petitioner contends his due process was violated by

3

the failure of the trial court to adequately instruct the jury on the elements of the murder

4

charge. (Pet. at 7, 18-20.) Specifically, Petitioner claims that the court improperly

5

instructed the jury regarding the requisite intent required for second degree murder. (Id.)

6

1.     State Decision

7

In the last reasoned decision denying Petitioner's claim, the appellate court

8

explained:

9

B. Second Degree Murder

10

Pursuant to CALCRIM No. 251, jurors were instructed: "The crimes

11

and other allegations charged in this case require proof of the union or joint operation of act and wrongful intent. For you to find a person guilty of

12

the crime[] of murder as charged in Count I …, that person must not only intentionally commit the prohibited act, but must do so with the specific

13

intent and mental state. [P] The act and the specific intent and mental state required are explained in the instruction for that crime or allegation."

14

Subsequently, CALCRIM No. 520 was given. It told jurors: "The defendants are charged in Count I with murder in violation of Penal Code

15

Section 187. To prove that defendant is guilty of this crime, the People must prove that, one, the defendants committed an act that caused death

16

of another person; two, when the defendant acted, he had a state of mind called malice aforethought; and, three, he killed without lawful justification.

17

[P] There are two kinds of malice aforethought: Expressed [sic] malice and implied malice. Proof of either is sufficient to establish the state of mind

18

required for murder. [P] The defendant acted with expressed [sic] malice if he unlawfully intended to kill. [P] The defendant acted with implied malice

19

if first he intentionally committed an act; second, the natural consequences of the act were dangerous to human life; third, at the time

20

he acted, he knew his act was dangerous to human life; and fourth, he deliberately acted with conscious disregard for human life."

21

Lopez now contends that second degree implied-malice murder is a

22

general intent crime, yet the trial court erroneously instructed that all forms of murder required a finding of specific intent. Lopez says the error denied

23

him due process by blocking jury consideration of second degree implied-malice murder as a lesser included offense.

24

We do not agree with Lopez's premise. Although arguably not a

25

specific intent, implied malice is not truly a general intent, but rather is a specific state of mind. (People v. Whitfield (1994) 7 Cal.4th 437, 450,

26

superseded by statute as stated in People v. Mendoza (1998) 18 Cal.4th 1114, 1126.) Significantly, CALCRIM No. 251, as given here, did not tell

27

jurors that murder required a specific intent to kill. (Compare People v. Rogers, supra, 39 Cal.4th at pp. 872-873.) We see no conflict between it

28

and CALCRIM No. 520, and no reasonable likelihood jurors misconstrued the instructions in the way Lopez claims. (See Estelle v. McGuire (1991)

502 U.S. 62, 72; People v. Dieguez (2001) 89 Cal.App.4th 266, 276.)

        Even if we were to find error, we would conclude it was harmless, whether assessed under the Watson standard applicable to failures to instruct on lesser included offenses (People v. Rogers, supra, 39 Cal.4th at pp. 867-868) or the more stringent Chapman test applicable to conflicting intent instructions and instructions that misdescribe an element of an offense (People v. Chun (2009) 45 Cal.4th 1172, 1201; People v. Lee (1987) 43 Cal.3d 666, 676; People v. Jeter (2005) 125 Cal.App.4th 1212, 1217). Jurors found the murder to have been premeditated; hence, they necessarily found intent to kill. (See CALCRIM No. 521.) Moreover, jurors returned a verdict of second degree murder against Martinez under the same instructions, demonstrating that their consideration of the lesser offense was not impaired in any way. (See People v. Jackson (1989) 49 Cal.3d 1170, 1199.)

People v. Martinez, 2009 Cal. App. Unpub. LEXIS 10039 at 90-93.

        2.    Legal Standard

        Jury instructions are generally matters of state law for which federal habeas relief is not available, except insofar as an instructional error implicates the fundamental fairness of a trial in violation of due process or infringes upon an enumerated federal constitutional right. See Waddington v. Sarausad, 555 U.S. 179, 129 S. Ct. 823, 172 L. Ed. 2d 532 (2009); Estelle v. McGuire, 502 U.S. 62, 71-72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). For example, jury instructions may be challenged as constitutionally infirm if they had the effect of relieving the State of its burden of persuasion, beyond a reasonable doubt, on every essential element of a crime. Francis v. Franklin, 471 U.S. 307, 313, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985) (citing Sandstrom v. Montana, 442 U.S. 510, 520-524, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). Even if an error occurred in instructing the jury, however, habeas relief will be granted only if the petitioner can establish that the error had a substantial and injurious effect or influence in determining the jury's verdict. Hedgpeth v. Pulido, 555 U.S. 57, 129 S. Ct. 530, 532, 172 L. Ed. 2d 388 (2008) (holding that instructional errors that do not "categorically 'vitiat[e] all the jury's findings" are subject to harmless error analysis (alteration in original)); Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).

        3.    Analysis

        As the state court correctly noted, the jury returned a verdict of second degree

1  murder for Petitioner, demonstrating that the consideration of the lesser offense was not

2  impaired. Accordingly, Petitioner benefitted from the instructions for the lesser offense,

3  unlike his co-defendant who was convicted of first degree murder, and raised this claim

4  on appeal. Regardless whether the state court was reasonable in determining that the

5  instruction properly described the level of intent required for second degree murder,

6  Petitioner was not prejudiced by, but rather benefited from, the instruction.

7        Petitioner has not demonstrated the instruction rendered his trial fundamentally

8  unfair. Estelle, 502 U.S. at 72. Petitioner benefited from the instruction and the

9  conclusion of the state court was not contrary to federal law. The state court was

10  reasonable in rejecting Petitioner's claim. See Brecht, 507 U.S. at 637. The Court

11  recommends that Petitioner's claim be denied.

12  **IV.    RECOMMENDATION**

13        Accordingly, it is hereby recommended that the petition for a writ of habeas

14  corpus be DENIED with prejudice.

15        This Findings and Recommendation is submitted to the assigned District Judge,

16  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after

17  being served with the Findings and Recommendation, any party may file written

18  objections with the Court and serve a copy on all parties. Such a document should be

19  captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply

20  to the objections shall be served and filed within fourteen (14) days after service of the

21  objections. The parties are advised that failure to file objections within the specified time

22  may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153

23  (9th Cir. 1991).

24

25  IT IS SO ORDERED.

26      Dated:   June 19, 2014          /s/ _Michael J. Seng_

27                                      UNITED STATES MAGISTRATE JUDGE

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28